Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 1 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 1 of 143

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE

PITTSBURGH CORNING                  Bankruptcy No. 00-22876 (JKF)
CORPORATION,                        Chapter 11

     Debtor.                       Related to Doc. No. 8928,[1] dated January 29, 2009,
                                    Modified Third Amended Chapter 11 Plan and
                                    documents.

---

[1] On April 20, 2012, Plan Proponents filed Doc. No. 8781, Notice of Filing Plan Materials with Proposed Amendments. The documents include the Modified Third Amended Plan of Reorganization, Jointly Proposed by Pittsburgh Corning Corporation, the Official Committee of Asbestos Creditors and the Future Claimants' Representative, dated January 29, 2009, as amended on September 23, 2011, Doc. Nos. 8459, 8485, and the proposed amendments filed after September 23, 2011, Doc. No. 8459, and supplemented October 5, 2011, Doc. No. 8485. The Plan Proponents are the Debtor, the Official Committee of Asbestos Creditors, and the Future Claimants' Representative. The documents filed at Doc. No. 8781 include proposed amendments to (1) the Plan and (2) Exhibit F (including Schedule L), Exhibit I (including Exhibits 1 and 4 and Schedule D), Exhibits M and N, and a proposed new exhibit, Exhibit O. All other exhibits are as they appeared in the September 23 and October 5, 2011, filings. On August 17, 2012, Plan Proponents filed the Modified Third Amended Plan at Doc. No. 8928. Doc. No. 8955, Plan Proponents' Summary of Plan Documents Attached as Exhibits, was filed on August 31, 2012. A Summary of the Modified Third Amended Plan was filed on August 31, 2012, Doc. No. 8956, and a Summary of Technical Amendments to Prior Plans was filed on the same date at Doc. No. 8957. The Notice Regarding Proposed Confirmation Order Language to Address Certain Mt. McKinley Objections, filed on October 25, 2012, at Doc. No. 9060 and Mt. McKinley's Notice Regarding Reservation of Rights, filed on October 30, 2012, at Doc. No. 9066, also resolved certain objections and modified the Plan accordingly. Additional technical amendments were filed on May 15, 2013 at Doc. No. 9402 to address deletions to the definition of Asbestos Protected Parties, to delete a *proviso* from 11.17.1 (insurance neutrality), to update Exhibits K (identifying the entities and affiliates of Corning) and L (identifying the entities and affiliates of PPG covered by the Asbestos Permanent Channeling Injunction) and Exhibit F (the Trust Funding Agreement) Schedules B, F and H regarding changes of names or contact information of certain insurers or their representatives.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 2 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 2 of 143

**REVISED MEMORANDUM OPINION SETTING FORTH FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE MODIFIED
THIRD AMENDED PLAN OF REORGANIZATION AS MODIFIED THROUGH MAY
15, 2013, AND THE ASBESTOS PERMANENT CHANNELING INJUNCTION[2]**

I.      **INTRODUCTION**

By Order dated December 21, 2006, this Court denied confirmation of the Second

Amended Plan of Reorganization Dated November 20, 2003.  Doc. No. 5192; 417 B.R. 289

(Bankr. W.D. Pa. 2006).  By Order dated June 16, 2011, this Court denied confirmation of the

Modified Third Amended Plan dated January 29, 2009, with Plan Amendments to Date (May 19,

2010,  Doc. No. 7704),[3] (as modified on June 8, 2010, Doc. No. 7798 ("Third Amended Plan")).

Doc. No. 8321; 453 B.R. 580 (Bankr. W.D.Pa. 2011).[4]  As further described below, the Third

Amended Plan provides for the channeling of "Channeled Asbestos PI Trust Claims" to an

Asbestos Personal Injury Trust ("Asbestos PI Trust").[5]  Plan Proponents (Pittsburgh Corning, the

Asbestos Creditors' Committee ("ACC") and the Future Claimants' Representative ("FCR"))

subsequently proposed additional amendments to the Third Amended Plan to address the Court's

---

[2]In some instances we have used the record cites provided by Plan Proponents in their
updated proposed findings at Doc. No. 9303.  However, where a docket number reference
existed we substituted the docket number for the Exhibit number where appropriate.  Where Plan
Proponents' record cites were incorrect we have corrected or deleted them.

[3]The Third Amended Chapter 11 Plan was initially dated January 29, 2009.  Doc. No.
6412.  Doc. No. 7704, January 29, 2009, Plan with amendments, was filed on May 19, 2010.

[4] The Third Amended Disclosure Statement had been approved by order of July 6, 2009.
Doc. No. 6747.  Debtor filed a Notice Regarding Description of Third Amended Disclosure
Statement to Accompany the Modified Third Amended Plan of Reorganization, Doc. No. 8954,
stating that although the Plan had changed in certain respects, no further disclosures were
necessary.

[5]Unless  otherwise defined herein, all capitalized terms shall have the meaning assigned
thereto in the Plan.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 3 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 3 of 143

concerns and other pending objections. Those amendments are incorporated in the Modified

Third Amended Plan of Reorganization ("Plan") filed on August 17, 2012, at Doc. No. 8928. It

is this Plan, as further modified, that is before the Court for confirmation and about which this

Memorandum Opinion and Order are issued.

The Court issued a Memorandum Opinion[6] and Interim Order confirming the Plan on

May 16, 2013, Doc. Nos. 9409 and 9410, and provided the parties the opportunity to file motions

for reconsideration so that this Court could correct any typographical or scrivener's errors or any

omissions or inaccuracies. Mt. McKinley Insurance Company and Everest Reinsurance

Company (collectively "Mt. McKinley")[7] and Certain Underwriters at Lloyd's, London and

Certain London Market Insurers ("LMI") filed motions at Doc. Nos. 9420 and 9421 respectively.

A third motion for reconsideration was filed collectively by Debtor, the ACC, FCR, PPG, and

Corning. Doc. No. 9422. A hearing was held on May 23, 2013, and the Court herein revises in

part the Interim Memorandum Opinion and Interim Order to correct typographical and

scrivener's errors and to make certain of the changes requested by the parties. Any change

requested in a motion for reconsideration not specifically referred to herein or in the

Confirmation Order is, to the extent and in the form that a change requested by a party appears

herein, accepted by the Court. The Court has considered all of the parties' submissions and

heard argument at the May 23, 2013 hearing, and the Order accompanying this Memorandum

Opinion constitutes the final appealable order of this Court with respect to confirmation of the

---

[6]The May 16, 2013, Memorandum Opinion was not titled "Interim" but in effect was so.

[7]Mt. McKinley noted that the Court did not address pending motions for reconsideration, Doc. No. 8345, and for entry of a case management order, Doc. Nos. 8369 and 8370, filed after entry of our 2011 Memorandum Opinion denying confirmation. *In re Pittsburgh Corning Corporation*, 453 B.R. 570 (Bankr. W.D. Pa. 2011). These will be addressed by separate orders.

3

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 4 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 4 of 143

Plan.

After considering the entire record of this case, the Plan and Plan Documents, the Disclosure Statement, transcripts of testimony at the confirmation hearings held on May 3 to 6, 2004, and June 3, 4, 9 and 10, 2010, exhibits admitted into evidence, various briefs and argument at hearings with respect to the August 17, 2012, amendments and additional proposed amendments as well as the remaining objections of Garlock Sealing Technologies, Inc. ("Garlock") and Mt. McKinley Insurance Company and Everest Reinsurance Company (together, "Mt. McKinley"), the Court makes the following Findings of Fact and Conclusions of Law.  To the extent that a finding of fact is found to have been incorrectly designated herein as a "Conclusion of Law," it shall be deemed a Finding of Fact.  Similarly, to the extent that a conclusion of law is incorrectly designated herein as a "Finding of Fact," it shall be deemed a Conclusion of Law.  As will be explained, *infra*, the Court makes these Findings and Conclusions solely for purposes of determining that this Plan is confirmable.  Moreover, the Plan is "insurance neutral" and preserves any and all coverage issues for resolution in a non-bankruptcy proceeding, using applicable non-bankruptcy law.  Because none of the rights, obligations, defenses, claims or issues concerning coverage are before this Court, and because the Plan and Plan Documents preserve them for resolution elsewhere, the objections of insurers Mt. McKinley and Everest Insurance Company (as defined above, "Mt. McKinley") are overruled, as are the objections of Garlock Sealing Technologies, Inc. for lack of standing.  However, inasmuch as the record also demonstrates that the objections lack merit, they are overruled on that basis as well.

As an overview to what this Opinion does and does not do, and how this Plan has been

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 5 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 5 of 143

modified to cure what was previously unconfirmable, it is significant that in this version of the

Plan, the nature of the Plan funding has changed, as Corning no longer is contributing proceeds

of its insurance but is contributing other assets as the "Corning Trust Contribution." *See infra.*

The Corning Trust Contribution has no direct connection to insurance. We express no opinion as

to whether the settled insurance policies or any policies are exhausted, which entities they cover,

what the policies require from the insured in order to attain payment for individual claims or

reimbursement of any contribution by PPG or Corning, or whether any settlement is reasonable

for coverage purposes notwithstanding the reasonableness of the settlements for Plan purposes

and as between the parties to the settlements.  We further express no opinion as to whether any

asbestos personal injury claims to be paid by the Trust, to the extent PPG  or Corning seeks to

recover its contributions from Mt. McKinley, were properly paid under any PPG or Corning

policy issued by Mt. McKinley.  The Trust Distribution Procedures are reasonable and properly

designed to pay claims for purposes of 11 U.S.C. §524(g) but this is not a determination of

whether Mt. McKinley will owe PPG or Corning.

We find, in accord with §524(g)(4)(B)(ii), that the Plan is fair and equitable to those

holding Channeled Asbestos PI Trust Claims, including Demands, and that the Asbestos

Protected Parties are entitled to the protection of the Channeling Injunction.  The Asbestos PI

Trust will assume the liabilities of the Debtor which has been named in suits for damages

allegedly caused by the presence of or exposure to asbestos or asbestos-containing products.

The funding of the Plan by the Debtor and others is adequate to address the obligation to make

payments to present Claimants and future Demand holders.  The Debtor, PPG and Corning are

likely to be subject to substantial future demands for payment arising out of the same conduct,

5

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 6 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 6 of 143

products and events to be addressed by the injunction but the amounts, numbers and timing of

such future demands cannot be determined.  PPG and Corning are likely to continue to face

allegations that they are responsible for the conduct of,  claims against, or demands on the

Debtor by virtue of their corporate relationship.  The Plan and the Trust Distribution Procedures

are constructed so as to deal equitably with Claims and Demands.

Thus, after 13 years in bankruptcy, objections to the Plan by non-creditor parties

(attempts at resolutions of which resemble the game of Whack-a-Mole[8]) and the consensus of

nearly all voting creditors, this Plan will be confirmed and the requested channeling injunction

will be issued pursuant to §524(g) of the Bankruptcy Code.

## II.    PROCEDURAL BACKGROUND

1. On April 16, 2000 (the "Petition Date"), Pittsburgh Corning Corporation ("Debtor,"

"PCC" or "Pittsburgh Corning") filed a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code.

2. The Debtor experienced an influx of asbestos claims in the late 1990s and, as of the

Petition Date, there were approximately 235,000 asbestos claims pending against it.  Doc. No.

6426, Third Amended Disclosure Statement at 31; Doc. No. 3308, Tr. 5/5/04 at 230:19-24

(Fitzpatrick).  Pittsburgh Corning also filed for bankruptcy in an effort to survive as a viable

reorganized company.  Doc. No. 3290, PM Tr. 5/3/2004 at 113:7-8 (Ellis).  The financial burden

on Pittsburgh Corning caused by declining insurance, increasing "burn rate" of available

insurance which rose from $8 - $10 million per month in the mid-1990s to $26 - $34 million per

---

[8] From http://en.wikipedia.org/wiki/Whac-A-Mole : "Colloquial usage - The term
'Whac-a-mole' (or 'Whack-a-mole') is used colloquially to denote a repetitious and futile task:
each time an adversary is 'whacked' it only pops up again somewhere else."  Last visited May
16, 2013.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 7 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 7 of 143

month in 1999, and increasing defense and indemnity costs led to its conclusion that its liabilities

for asbestos claims were greater than the value of its assets.  PM Tr. 5/3/2004 at 108:16-109:8,

112:14-19 (Ellis); PM Tr. 5/3/2004 at 111:25-113:3 (Ellis); PM Tr. 5/3/2004 at 119:22- 120:8

(Ellis); PM Tr. 5/3/2004 P.M. at 112:23-113:3 (Ellis).

3.  The Debtor was formed in 1937 by the Pittsburgh Plate Glass Company (now PPG

Industries, Inc.) ("PPG") and Corning Glass Works (now Corning Incorporated) ("Corning"),

with each owning, and continuing to own, fifty percent of the Debtor's capital stock.  (PPG and

Corning are hereafter referred to as "Shareholders" or "Plan Supporters").  Doc. No. 6426 at 28;

PM Tr.  5/3/04 at 65:11-13 (Ellis); Doc. No. 3288, PM Tr. 5/4/04 at 11:17-21 (Eggers).

4.  Upon the filing of the Petition, this Court issued a series of first-day orders, including

orders authorizing the retention of Reed Smith Shaw and McClay LLP (now Reed Smith LLP) as

counsel for the Debtor.  Doc. Nos. 35, 37, 38, 56, 57, 182.

5. The U.S. Trustee appointed the Committee of Unsecured Trade Creditors on April 28,

2000 ("Trade Committee").  Doc. Nos. 60, 181, 344, 972.

6. The U.S. Trustee appointed the Official Committee of Asbestos Creditors ("ACC") on

April 28, 2000.  Doc. Nos. 59 and 273.

7. The Court appointed Lawrence Fitzpatrick as the legal representative of persons who

may have asbestos-related claims against the Debtor in the future ("Future Claimants'

Representative" or "FCR").  Doc. No. 713. The FCR's authority was later expanded to include

representation of PPG and Corning Demand holders.  Doc. No. 2503.  The scope of the FCR's

authority was again modified on June 9, 2010, to clarify that upon the occurrence of the

Effective Date, the FCR will represent only the interests of future holders of Channeled Asbestos

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 8 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 8 of 143

PI Trust Claims. Doc. No. 7801.

8. This Court also issued a series of general operating orders that permitted the Debtor to continue in operation during its Chapter 11 Case. Doc. Nos. 37, 38, 56, 57, 157, 235, 291, 297, 301, 536, 986, 1101, 1568, 3364, 3650, 4195, 4525, 5526, 5917, and 6042.

9. By Order dated December 15, 2000, the Court authorized the Debtor to establish an Interim Qualified Settlement Fund ("QSF") for the purpose of depositing any insurance proceeds that were received by the Debtor from settling insurers for asbestos personal injury claims during the Chapter 11 Case. Doc. No. 633. The insurance proceeds in the QSF as of March 31, 2010, were $154,067,056.35. Doc. No. 7626. As of February 28, 2013, they were $156,717,211.39. Doc. No. 9274. Such assets are among those intended to be part of the Plan funding and to resolve competing claims to insurance proceeds potentially available to the Debtor for asbestos personal injury claims. Doc. No. 8928 at §9.1.3; *id.* at Exhibit M §II.A-D; PM Tr. 5/3/04 at 113:4-6, 18-21, 137:10-15 (Ellis); PM Tr. 5/4/04 at 44:14-18 (Eggers).

10. By Order dated December 10, 2004,[9] Doc. No. 3799, the Court approved a settlement by the Debtor and PPG with certain insolvent insurance companies (the "KWELMB Companies") and designated an existing escrow account as a QSF (the "KWELMB QSF"). As of April 30, 2010, the KWELMB QSF held $28,848,826.47 and, as of February 28, 2013, held $28,837,787.35. Doc. No. 9274. *See* Doc. No. 9303, Plan Proponents' and Plan Supporters' Proposed Findings of Fact and Conclusions of Law (hereafter "PFF") at ¶ 10.

11. Some of the competing claims to insurance coverage that would be resolved by the Plan, if confirmed, are those brought by PPG in Adversary No. 00-2201, *PPG Industries, Inc. v.*

---

[9]Although the Order is dated December 10, 2004, the docket entry was made on December 9, 2004.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 9 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 9 of 143

*Pittsburgh Corning Corporation, et al.*, which PPG filed on May 23, 2000, against Pittsburgh

Corning and the insurers that issued hundreds of insurance policies to PPG and Pittsburgh

Corning over a span of decades. *See* Doc. No. 8928, Exhibit M, Insurance Claims Agreement, at

§II.A-D.

12. Additional competing claims to insurance coverage that will be resolved by the Plan,

if confirmed, are those asserted by Pittsburgh Corning against certain policies of insurance

issued to Corning. These claims were asserted in Adversary No. 02-2445, *Corning Incorporated*

*v. Pittsburgh Corning Corporation, et al.,* filed on July 26, 2002, by Corning against Pittsburgh

Corning and certain insurers, including those insurers that issued insurance policies to Corning

against which Pittsburgh Corning also noticed a claim. On June 20, 2007, the District Court

entered an order dismissing Corning's claims against the insurers without prejudice and staying

Pittsburgh Corning's claims against the insurers until after plan confirmation. *See* Civ. Action

No. 02-1898, Doc. No. 126. On July 11, 2007, the District Court entered a subsequent order

which dismissed Pittsburgh Corning's claims against the insurers without prejudice and subject

to a Tolling Agreement. Civ. Action No. 02-1898, Doc. No. 129. The conditional resolution of

the Debtor's claim to insurance under certain Corning Insurance Policies is set forth in Exhibit M

to the Plan (Insurance Claims Agreement), Doc. No. 8928, by which the Debtor, PPG, and

Corning would resolve their respective competing claims for insurance coverage for Asbestos PI

Trust Claims.

13. On November 20, 2003, Plan Proponents filed a Second Amended Plan, Doc. No.

2700, and later made technical amendments to it. *See* Doc. No. 3120, Expedited Motion for

Entry of Order Approving Technical Amendments to Second Amended Plan; Doc. No. 3185,

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 10 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 10 of 143

Order dated April 20, 2004.

14. On May 3-7, 2004, a confirmation hearing was held.

15. On December 2, 2004, the Court of Appeals for the Third Circuit published its

decision in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), which included a

discussion of the scope of protection available under 11 U.S.C. §524(g)(4)(A)(ii) to nondebtors.

16. Applying *Combustion Engineering* to the Second Amended Plan, this Court

concluded:

> As written, the plan runs afoul of the Combustion Engineering
> decision because it enjoins suits against the nondebtors PPG and
> Corning with respect to tort claimants on actions that do not arise
> derivatively from PCC.
>
> Based on the foregoing, we find that Corning and PPG are entitled
> to the channeling injunction for PC-Relationship claims, for
> Non-PC-Relationship claims arising from the "conspiracy theory"
> allegations such as concert of actions, conspiracy, alter ego, etc.,
> but not for claims that allege absolutely no connection with,
> interest in or involvement with PCC.

*In re Pittsburgh Corning Corp.*, 417 B.R. 289, 312 (Bankr. W.D. Pa. 2006).

17. The Court found that in all other respects, the Second Amended Plan satisfied the

requirements of §§524(g), 1123, 1124, 1125, 1126, 1127, 1128, and 1129 of the Bankruptcy

Code. 417 B.R. at 294-95.

18. Thereafter, various parties, including the Plan Proponents (Debtor, ACC and FCR)

and Plan Supporters (PPG and Corning), filed motions for reconsideration of the Court's order

denying confirmation of the Second Amended Plan.

19. At the request of various parties, the Court withheld ruling on the motions for

reconsideration to allow the Plan Proponents and Plan Supporters an opportunity to revise the

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 11 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 11 of 143

Second Amended Plan in order to address the issues that the Court identified as the reason for its denial of confirmation of the Second Amended Plan. Doc. No. 5812, Tr. 1/10/08 at 20.

20. On January 29, 2009, the Plan Proponents filed a Modified Third Amended Plan of Reorganization (Doc. No. 6412) to which amendments were filed on February 20, 2009 (Doc. No. 6443); January 6, 2010 (Doc. No. 7386); January 26, 2010 (Doc. No. 7432), and April 29, 2010 (Doc. No. 7645). An updated version of the Plan and all attachments, exhibits, and schedules including all amendments through April 29, 2010, was filed on May 19, 2010, at Doc. No. 7704. Another amendment was filed on June 8, 2010, at Doc. No. 7798.

21. After a hearing, confirmation of that Plan was denied by Opinion and Order dated June 16, 2011, because the definition of "Asbestos Personal Injury Claim" was overbroad and because the Plan was not insurance neutral under *Combustion Engineering*. *In re Pittsburgh Corning Corporation*, 453 B.R. 570 (Bankr. W.D. Pa. 2011). Motions for reconsideration were filed and various hearings were held over the course of several months.

22. On April 20, 2012, Plan Proponents filed Doc. No. 8781, Notice of Filing Plan Materials with Proposed Amendments. The documents include the Modified Joint Third Amended Plan of Reorganization dated January 29, 2009, as amended on September 23, 2011, Doc. Nos. 8459, 8485, and all proposed amendments filed after September 23, 2011, Doc. No. 8459, and supplemented October 5, 2011, Doc. No. 8485. Documents filed at Doc. No. 8781 include proposed amendments to (1) the Plan and (2) Exhibit F (including Schedule L), (3) Exhibit I (including Exhibits 1 and 4 and Schedule D), (4) Exhibit M, (5) Exhibit N, and a proposed new exhibit, (6) Exhibit O.

23. After several hearings and negotiations between and among Plan Proponents and Mt.

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 12 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 12 of 143

McKinley, Plan Proponents filed the Modified Third Amended Plan on August 17, 2012. Doc.
No. 8928. Doc. No. 8955, Plan Proponents' Summary of Plan Documents Attached as Exhibits,
was filed on August 31, 2012. A Summary of the Modified Third Amended Plan was filed on
August 31, 2012, Doc. No. 8956, and a Summary of Technical Amendments to Prior Plans was
filed on the same date at Doc. No. 8957. Certain Underwriters at Lloyd's London, London
Market Companies, filed a Notice Regarding Notice of Proposed Clarifying Plan Amendments,
Doc. No. 8963, and a stipulation between Pittsburgh Corning and Certain London Market
Insurers was filed on September 20, 2012, Doc. No. 8989. Among other things, the amendments
changed the definitions of "Asbestos Permanent Channeling Injunction" and "Channeled
Asbestos PI Trust Claim" and added definitions of "Non-Derivative PPG/Corning Claim" and
"PCC Conspiracy Theory Claim." The State of Michigan Department of Treasury objected to
confirmation, Doc. No. 8974, but withdrew its objection. Doc. No. 9027. A Stipulation by
Corning, PPG, and Reaud, Morgan Quinn, L.L.P was filed resolving the Reaud Morgan
Claimants' objections. Doc. No. 8985.

24. Objections to confirmation were again filed by Mt. McKinley. Doc. No. 8984. After
a hearing on October 10, 2012, the Debtor proposed language for inclusion in any confirmation
order that would resolve two discrete Mt. McKinley objections. Notice Regarding Proposed
Confirmation Order Language to Address Certain Mt. McKinley Objections, Doc. No. 9060.
Mt. McKinley acknowledged that the changes proposed in Doc. No. 9060 would resolve its
objections but only in part. The changes included (1) removal of the phrase "or its predecessors
or Affiliates" from Plan §§8.1.18 and 8.1.28 and (2) a method by which Mt. McKinley would
have a means to satisfy potential Medicare, Medicaid, and SCHIP Extension Act of 2007

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 13 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 13 of 143

(hereafter "MMSEA") reporting requirements (*see infra*), if any, or by which it would otherwise have access to information necessary to fulfill any reporting requirements. The language proposed to address the MMSEA reporting requirements will be added to the Confirmation Order. *See* Doc. No. 9060 at Exhibit C, ¶ 3. The language in the Notice (Doc. No. 9060) related to §§8.1.18 and 8.1.28 of the Plan did not, however, resolve all of Mt. McKinley's objections to those sections and others. Such unresolved objections include an argument that such findings are unnecessary to Confirmation and are not supported by the evidence. Mt. McKinley's Notice Regarding Reservation of Rights, Doc. No. 9066. We agree with Mt. McKinley that the findings in §§8.1.18 and 8.1.28 should not be made, even with deletion of the words "or its predecessors or Affiliates." The "inextricably intertwined" language in both sections is over-inclusive and the findings are not necessary for Plan confirmation.

25. Garlock Sealing Technologies, Inc., also objected to the Modified Third Amended Plan. Doc. No. 8983. For the reasons stated herein and our prior decision with respect to confirmation of the Plan in 2011, 453 B.R. 570 (Bankr. W.D. Pa. 2011), Garlock's objections are overruled as discussed more fully *infra*.

**III.   HISTORY OF PITTSBURGH CORNING AND ITS SHAREHOLDERS, THE ASBESTOS CLAIMS AGAINST THEM, AND THE INSURANCE FOR SUCH CLAIMS**

**A.   Pittsburgh Corning's Corporate History**

26. Corning and PPG formed Pittsburgh Corning to develop, manufacture, and sell glass building products. PM Tr. 5/4/04 at 11:17-12:5 (Eggers).

27. Employees of PPG and Corning served as directors of Pittsburgh Corning. The number of directors varied over time but historically included representatives of the Shareholders

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 14 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 14 of 143

as well as Pittsburgh Corning. For example, during the time David Ellis was the corporate secretary of Pittsburgh Corning, from 1986 through 2001, there were five directors – two PPG employees, two Corning employees, and Pittsburgh Corning's President/CEO. PM Tr. 5/3/04 at 65:8-17 (Ellis). *See also* Doc. No. 3308, Tr. 5/5/04 at 99:7-9 (Diggs).

28. Historically, Pittsburgh Corning's two principal products were glass block and Foamglas®, a cellular glass insulation product. Neither product contained asbestos. PM Tr. 5/3/04 at 65:18-66:8 (Ellis).

29. Foamglas® insulation is also produced by Pittsburgh Corning Europe, N.V. ("PCE"), a licensee of the Debtor in which PPG and Corning each own fifty percent of the capital stock. PCE's manufacturing facilities are located in Belgium, Germany, and the Czech Republic. PM Tr. 5/3/2004 at 120:23-121:12 (Ellis); Doc. No. 6426 at 29.

30. Except for the effects of asbestos litigation against it, Pittsburgh Corning operates a profitable business. Doc. No. 6426 at 30; Doc. No. 7823, Tr.6/3/10 at 77:1-5; Doc. No. 9274, Monthly Operating Report for period ending February, 2013.

**B.     The Background of PPG and Corning**

31. PPG is a global manufacturer and distributor of basic materials and is headquartered in Pittsburgh, Pennsylvania. PPG has manufactured coatings, glass, chemicals, and fiberglass, with operations throughout the world. Tr. 5/5/04 at 94:15-23 (Diggs).

32. Corning manufactures and supplies specialty glass and glass ceramic products with primarily four product segments: (1) optical fiber, optical communications cable, and related hardware and equipment to the telecommunications industry; (2) glass used in liquid crystal displays for computers and televisions; (3) ceramic honeycomb material used for emission

14

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 15 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 15 of 143

control in automobiles; and (4) glass and plastic laboratory equipment for the life sciences
industry.  PM Tr. 5/4/04 at 10:19-11:16 (Eggers).

    **C.**    **Pittsburgh Corning's Unibestos Business**

33. From 1962 to 1972, Pittsburgh Corning manufactured and sold an asbestos containing
molded pipe insulation called Unibestos, which was made of amosite asbestos fibers,
diatomaceous earth, and sodium silicate.  PM Tr. 5/3/2004 at 66:9-67:1 (Ellis).

34. Unibestos was a high-temperature pipe insulation product manufactured by
Pittsburgh Corning at its Tyler, Texas, and Port Allegany, Pennsylvania, plants.  *Id.* at 67:2-9
(Ellis).

35. Unibestos was installed at work sites requiring high temperature insulation, such as
shipyards, naval facilities, steel mills, oil refineries, petrochemical plants and heavy industrial
sites.  *Id.* at 67:10-15 (Ellis).

36. Pittsburgh Corning's manufacture of Unibestos eventually led to its being named a
defendant in hundreds of thousands of asbestos-related personal injury lawsuits.  *Id.* at 68:11-16,
94:20-23 (Ellis); Doc. No. 6426 at 31.

37. In 1972, the Debtor ceased its Unibestos production.  PM Tr. 5/3/2004 at 66:24-67:1
(Ellis); Doc. No 6426 at 28.

38. Any exposure to the asbestos in Unibestos for the most part occurred in the years it
was manufactured, 1962-1972.  PM Tr. 5/3/2004 at 68:11-21 (Ellis).

39. Neither PPG nor Corning manufactured, distributed, or sold Unibestos, with the
exception of two sales of Unibestos by PPG's fiberglass division in August and October 1969 for
sales prices of $384.00 and $292.80, respectively.  PM Tr. 5/4/04 at 12:15-17, 73:8-11 (Eggers);

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 16 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 16 of 143

Tr. 5/5/04 at 32:19-34:24 (Seymour); Doc. No. 6426 at 35.

**D.**    <u>**The Unibestos Suits Against Pittsburgh Corning and its Shareholders**</u>

40. Beginning in the mid- to late-1960s, Pittsburgh Corning began to face lawsuits

alleging asbestos injuries from exposure to Unibestos.  PM Tr. 5/3/2004 at 68:11-14 (Ellis).

41. In 1974, former workers at Pittsburgh Corning's Tyler plant filed a series of cases

called the *Yandle/Kay* cases.  These cases involved approximately 450 plaintiffs and were

pending in the United States District Court for the Eastern District of Texas.  *Id.* at 79:9-80:1

(Ellis); PM Tr. 5/4/04 at 13:2-19 (Eggers); Exhibit P-5.

42. The named defendants in the *Yandle/Kay* cases included PPG, Dr. Lee Grant

(Medical Director of PPG and medical consultant to Pittsburgh Corning), Corning, Pittsburgh

Corning, and others.  PM Tr. 5/3/04 at 80:2-16 (Ellis); Exhibit P.

43. Paragraph 5 of the Complaint in *Yandle v. PPG Industries, et al.*, filed on or about

January 2, 1974, alleged, *inter alia*, as follows:

> Defendants, PPG Industries, Inc. and Corning Glass Works,
> Incorporated at all times material hereto have been aware of the
> conditions existing at the Pittsburgh Corning Plant at Tyler, Texas
> which gave rise to the damages sustained by plaintiffs.  Said
> corporations, although knowing of the dangers and hazards, and
> being in a position to correct deficiencies at the said plant because
> of their beneficial ownership and right to control and manage
> Pittsburgh Corning Corporation have failed to correct such
> deficiencies or warn the employees there at of the dangers of
> exposure to asbestos in the concentration present therein, such acts
> being of omission and commission and constituting negligence and
> a proximate cause of the injuries and damage alleged herein.
> Defendant Dr. Lee B. Grant, an agent and employee of PPG
> Industries, Inc., on several occasions visited said Tyler plant and
> surveyed and monitored the conditions present therein.  Further,
> Dr. Grant, on several occasions, conducted examinations of the
> workers therein, yet failed and refused to advise such workers of
> health hazards and of their own physical problems.  Such acts and

16

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 17 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 17 of 143

> omissions constitute negligence and a proximate cause of the
> damages alleged herein.

PM Tr. 5/3/04 at 79:23-80:20 (Ellis); Exhibit P-5.

44. Ultimately, around 2000 individual claims were part of the *Yandle/Kay* cases. PM Tr. 5/3/04 at 80:21-81:3 (Ellis).

45. The *Yandle/Kay* cases were settled by the defendants for a total of approximately $20 million. Settlement payments were made by or on behalf of Pittsburgh Corning, PPG, and Corning. *Id.* at 80:21-81:13, 82:17-83:5 (Ellis); PM Tr. 5/4/04 at 13:16-14:6 (Eggers).

46. After the *Yandle/Kay* settlement, business invitees, temporary employees of the Tyler plant, and residents who lived within a mile or two of the Tyler plant filed another series of cases against Pittsburgh Corning, PPG, and Corning, generally referred to as the *Tyler II* cases. The *Tyler II* cases again alleged liability against PPG and Corning for exposures to asbestos. PM Tr. 5/3/04 at 83:6-84:11 (Ellis); PM Tr. 5/4/04 at 14:7-14 (Eggers); Exhibits P-6 to P-14.

47. There were thousands of plaintiffs in the *Tyler II* cases, and these cases were settled by Pittsburgh Corning, PPG, and Corning for approximately $1.2 million. PM Tr. 5/3/2004 at 84:12-24 (Ellis); Doc. No. 3287, AM Tr. 5/4/2004 at 82:9-19 (Ellis); PM Tr. 5/4/2004 at 14:7-23, 76:7-14 (Eggers).

48. Corning had moved for summary judgment in the *Tyler II* cases, but the Court did not act upon its motion. PM Tr. 5/4/2004 at 14:24-15:4 (Eggers).

49. Employees of Pittsburgh Corning's Port Allegany plant also sued Pittsburgh Corning, PPG, and Corning in a case called *Barber*. Pittsburgh Corning and Corning were dismissed from the case by a Pennsylvania trial court on different grounds. The *Barber* case was ultimately settled by PPG. PM Tr. 5/3/2004 at 84:25-85:15 (Ellis); AM Tr. 5/4/2004 at 82:20-83:5 (Ellis);

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 18 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 18 of 143

PM Tr. 5/4/2004 at 15:5-15 (Eggers).

50. Cases alleging joint liability against Pittsburgh Corning, PPG, and Corning for exposure to the Unibestos product were also filed in situations other than those involving the Tyler and Port Allegany manufacturing operations.  PM Tr. 5/3/2004 at 86:2-8, 87:17-90:10 (Ellis); PM Tr. 5/4/2004 at 17:22-19:22 (Eggers); Exhibits P-15, P-16, P-18, P-19, P-120, P-121, P-122, P-123, P-124, P-125, P-126, and P-127.

51. Some of the lawsuits naming PPG and Corning pled claims that allegedly arose out of the Shareholders' ownership of a financial interest in Pittsburgh Corning and also out of their alleged right to control and manage Pittsburgh Corning.  PM Tr. 5/4/2004 at 12:13-13:1, 15:25-16:22, :73:8-74:4 (Eggers); Tr. 5/5/2004 at 24:13-25:15 (Seymour), 98:17-99:17, 101:6-14 (Diggs); 10/28/2009 DEP. Tr. at 96:15-98:18 (Hatton); see, e.g. Exhibits P-5, P-15, P-16, P-18, P-19, P-120, P-121, P-122, P-123, P-124, P-125, P-126, and P-127.

52. Among the several purported legal theories alleged against PPG and Corning for Unibestos liability were:  alter ego, piercing the corporate veil, domination and control, concert of action, common enterprise, aiding and abetting, respondeat superior, negligent provision of services, principal/agent liability, mere instrumentality theory, successor-in-interest, and conspiracy.  PM Tr. 5/3/2004 at 88:23-89:23, 96:13-98:8 (Ellis); AM Tr. 5/4/2004 at 108:5-16 (Ellis); PM Tr. 5/4/2004 at 12:18-13:1, 16:16-17:19, 73:14-74:4 (Eggers); Tr. 5/5/2004 at 24:13-25:15 (Seymour), 98:17-99:24, 101:6-23 (Diggs); Exhibits P-16, P-18, P-54, P-120, P-121, P-122, P-123, P-124, P-125, P-126, and P-127.

53. In lawsuits filed against Pittsburgh Corning, PPG, and/or Corning, insurance carriers of the defendants, including without limitation PCC Settled Insurers, were frequently included as

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 19 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 19 of 143

defendants.  See Exhibits P-120 ¶ 9 and attachment B, ¶¶ 27, 34, 46-53; P-121 (same); P-122

(same); P-123 ¶ 9 and attachment B, ¶¶ 27, 34, 46-53; P-121 (same); P-122 (same); P-123 ¶ 9

and attachment B, ¶ 29, 36, 48-55; P-124 (same references as P-120); P-125 (same); P-126

(same); and P-127 (same).  Those complaints included allegations that the defendant insurers

conspired with, *inter alia*, Pittsburgh Corning to suppress information regarding the dangers

associated with asbestos exposure and that this alleged conspiratorial misconduct resulted in the

claimants' asbestos-related injuries.  *Id.*

54. In 1981, Pittsburgh Corning had approximately 15,000 to 20,000 claims pending or

open against it. Between 1981 and 1985, the number of claims increased.  By 1985, Pittsburgh

Corning had approximately 60,000 to 75,000 open claims.  PM Tr. 5/3/2004 at 102:9-103:4

(Ellis).

55. Before the Petition Date, Pittsburgh Corning defended and resolved more than

200,000 Unibestos claims at a cost of approximately $1.2 billion.  Doc. No. 6426 at 31; PM Tr.

5/3/2004 at 106:5-10 (Ellis).

56. As of the Petition Date, Pittsburgh Corning had approximately 235,000 Unibestos

claims pending against it.  Doc. No. 6426 at 31; Tr.  5/5/2004 at 230:19-24 (Fitzpatrick).

57. At the time Pittsburgh Corning filed its Petition, PPG was named as a defendant by

approximately 116,000 Unibestos claimants, and Corning was named as a defendant by

approximately 11,400 Unibestos claimants.  Doc. No. 6426 at 32, 38; Tr. 5/5/2004 at 230:19-24

(Fitzpatrick).

E.      **Asbestos Claims Against PPG**

58. PPG has been named as a defendant in lawsuits by claimants that allege that PPG is

19

Case 2:13-cv-01639-JFC    Document 1    Filed 11/18/13    Page 20 of 100
Case 00-22876-TPA    Doc 9443-2    Filed 05/24/13    Entered 05/24/13 19:18:36    Desc
Corrected Order to fix Typo    Page 20 of 143

liable for bodily injury they allegedly sustained as a result of exposure to Pittsburgh Corning's

Unibestos product. These Claims have been referred to as "PC-Relationship Claims." PM Tr.

5/3/2004 at 87:17-90:10 (Ellis); PM Tr. 5/4/2004 at 17:22-19:21 (Eggers); Tr. 5/5/2004 at

24:13-25:15, 27:5-29:20, 31:4-16 (Seymour), 98:17-103:5 (Diggs); Exhibits P-5, P-6, P-7, P-8,

P-9, P-10, P-11, P-12, P-13, P-15, P-16, P-18, P-19, P-27, P-28, P-120, P-121, P-122, P-123,

P-124, P-125, P-126, and P-127.

 59. Over the last thirty years, asbestos Claimants have asserted against PPG liability for

the Pittsburgh Corning Unibestos product and have conducted discovery relating to the

relationship between PPG and Pittsburgh Corning. *See* Tr. 5/5/2004 at 98:17-100:4 (Diggs). By

way of example, asbestos Claimants have on numerous occasions over many years taken

depositions of Dr. Lee Grant, a physician and former employee of PPG who from time to time

provided advice on medical issues to Pittsburgh Corning, including medical advice regarding

asbestos. PM Tr. 5/3/2004 at 80:2-8 (Ellis), Tr. 5/5/2004 at 99:18-100:4 (Diggs).

 60. Asbestos Claimants seeking to impose liability on PPG for Unibestos Claims have

relied upon a number of facts, including but not limited to the facts that: (1) PPG was a fifty

percent shareholder of Pittsburgh Corning; (2) employees of PPG were on the Pittsburgh

Corning Board of Directors; (3) PPG provided, at various times, certain services to Pittsburgh

Corning (including environmental, health and safety advice, and legal services); and (4) PPG and

Pittsburgh Corning have joint insurance coverage and PPG permitted Pittsburgh Corning to

participate in its insurance coverage program. Tr. 5/5/2004 at 98:25-99:17 (Diggs); P-18 ¶¶

65-76; P-54 ¶¶ 59, 60, 61(b)(vi), 64, 70; P-120 ¶¶ 65-76; P-121 ¶¶ 65-76; P-122 ¶¶ 65-76; P-123

¶¶ 62-73; P-124 ¶¶ 65-76; P-125 ¶¶ 65-76; P-126 ¶¶ 65-76; and P-127 ¶¶ 65-76.

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 21 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 21 of 143

61. As of the Petition Date, PPG was a defendant in asbestos-related lawsuits involving approximately 116,000 claimants. Tr. 5/5/2004 at 100:17-21 (Diggs). As of the Petition Date, there were fewer than 800 Asbestos PI Trust Claims against PPG that did not also assert claims against the Debtor. Tr. 5/5/2004 at 31:18-34:24 (Seymour), 103:6-21 (Diggs); Doc. No. 6426 at 32-35.

62. PPG has raised a number of defenses to liability for the asbestos claims against it and has stated that it believes that it is not responsible for any alleged injuries caused by Pittsburgh Corning's products. For instance, PPG has asserted that it cannot be held liable as a matter of law for any injuries caused by the product(s) of another corporation. Similarly, PPG has contended that it did not have and did not voluntarily assume a duty to the users of Pittsburgh Corning's product to warn them of any alleged dangers of Unibestos or otherwise protect those users from such dangers. Further, while the asbestos plaintiffs typically alleged that PPG should be held liable for the conduct of certain individuals employed by PPG, PPG has countered that there is no evidence that these individuals were acting within the scope of their employment with PPG at the time or that these individuals were subject to PPG's right of control. Finally, PPG has argued that in any event, there is no evidence to support the imposition of liability on PPG for any injuries arising out of Unibestos under any of the theories advanced by the asbestos plaintiffs. Doc. No. 6426 at 33.

63. Based on these and other defenses, prior to 2000, PPG had never been found liable for any claims arising out of an alleged exposure to Unibestos. In a number of cases, PPG had been dismissed on motions prior to trial. Doc. No. 6426 at 33; Tr. 5/5/2004 at 133:22-134:1 (Diggs). In a consolidated proceeding in West Virginia in 1998, a jury found that PPG was not

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 22 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 22 of 143

liable under a claim of aiding and abetting.  Similarly, in January 2000, a jury found PPG not

liable for negligence in a trial in Texas state court involving six plaintiffs.  Tr. 5/5/2004 at

103:1-5, 130:24-131:3 (Diggs).

64. When Pittsburgh Corning settled an asbestos bodily injury case, it typically obtained

a release that also encompassed PPG with no additional payment by PPG.  Tr. 5/5/2004 at

25:16-26:15 (Seymour), 100:5-16 (Diggs).

65. PPG had only one adverse jury verdict on a Unibestos claim.  Specifically, on April

14, 2000, a final judgment in a Unibestos case was entered against PPG in a case styled *Jerry*

*Sonnier, et al. v. Pittsburgh Corning Corporation, et al.* that was tried in the District Court of

Jefferson County, Texas.  The final judgment in the *Sonnier* case provided, *inter alia*, that PPG'S

negligence was a proximate cause of the asbestos related injuries and death and that PPG had

provided substantial assistance or encouragement to the Debtor in the commission of wrongful

conduct that was the proximate cause of asbestos-related injuries and death.  As a result of these

findings, PPG was found to be at fault for ten percent of the asbestos related injuries and death,

where applicable, of those plaintiffs.  Tr. 5/5/2004 at 130:20-23 (Diggs); Exhibits P-27, P-28.

The *Sonnier* Unibestos verdict is the only adverse asbestos verdict PPG experienced prior to the

entry of the stay on April 16, 2000.  Tr. 5/5/2004 at 78-79 (Seymour).  The Sonnier claim is the

subject of Adversary No. 00-2161.  An order was entered on May 11, 2010, approving a

Stipulation in the Adversary to permit certain claims to go forward and retain the injunction as to

others.  Adv. Doc. No. 462.

66. [Intentionally Omitted].

67. All or virtually all asbestos personal injury products liability claims against PPG have

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 23 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 23 of 143

included allegations about Unibestos or about PPG's relationship with Pittsburgh Corning. Tr. 5/5/2004 at 26:16-27:4 (Seymour), 103:10-13 (Diggs).

68. Typically, the asbestos claims against PPG contained general products liability allegations, or allegations that might be interpreted in such a manner, asserted against all defendants, along with specific allegations about PPG's relationship with Pittsburgh Corning. Tr. 5/5/2004 at 31:18-32:9 (Seymour), 101:24-102:7, 103:6-13 (Diggs); Exhibit P-15 ¶ 39 (identifying PPG as a defendant), ¶ 72 (asserting general products liability allegations against all asbestos defendants), ¶¶ 106-113 (asserting allegations relating to Pittsburgh Corning).

69. Historically, PPG had manufactured a limited number of products that contained asbestos as a component part, and PPG had sold a limited number of products that contained asbestos, but were manufactured by others. A description of products manufactured, distributed, or sold by PPG that may have contained asbestos can be found on pages 34-38 of the Third Amended Disclosure Statement, Doc. No. 6426. *See also* Doc. No. 8954.[10] *See also* Tr. 5/5/2004 at 32:10-34:24 (Seymour), 103:14-21 (Diggs).

70. One of the asbestos-containing products sold by PPG was manufactured by an unaffiliated company and sold by PPG under the brand name "Pyrocal." PPG's Pyrocal sales totaled less than $625,000. *See* Doc. No. 6426 at 35; Tr. 5/5/2004 at 104:6-10 (Diggs).

71. The Debtor did not manufacture, sell, and/or distribute Pyrocal or any other non-

---

[10]Doc. No. 6426 was filed on February 6, 2009. On August 31, 2012, Debtor filed Doc. No. 8954, titled Description of Third Amended Disclosure Statement to Accompany the Modified Third Amended Plan of Reorganization for Pittsburgh Corning Corporation Dated January 29, 2009, Jointly Proposed by Pittsburgh Corning Corporation, the Official Committee of Asbestos Creditors, and the Future Claimants' Representative. That document stated that, notwithstanding some changes to the Plan, none adversely changed the treatment of any creditor and therefore the Disclosure Statement approved by this court on July 6, 2009, Doc. No. 6747, was still adequate and did not need to be revised.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 24 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 24 of 143

Unibestos asbestos-containing product described in Section VI.C (Claims Against PPG) of the

Modified Third Amended Disclosure Statement filed with the Bankruptcy Court on February 6,

2009, Doc. No. 6426;  Doc. No. 7823, Tr. 6/3/2010 at 108:7-109:12 (Fitzpatrick).

72. In cases alleging exposure to Pyrocal or other unspecified asbestos-containing

products, claimants have alleged that, with respect to asbestos, PPG was, *inter alia*, engaged in a

civil conspiracy or joint enterprise with, or otherwise aided and abetted, Pittsburgh Corning and

also that PPG, Pittsburgh Corning, and other defendants were jointly liable for alleged injuries

caused by each defendant's products.  Exhibit P-15 ¶ 39 (identifying PPG as a "products

defendant"), ¶ 72 (asserting joint and several products liability claims), ¶ 88 (asserting

conspiracy claim), ¶¶ 105-114 (asserting specific allegations relating to Pittsburgh Corning);

Exhibit P-53 ¶ 8(bc) (alleging PPG's manufacture and sale of Unibestos through Pittsburgh

Corning and PPG's sale of Pyrocal), ¶ 14 (asserting existence of conspiracy), ¶¶ 16, 18-19

(asserting joint and several products liability claims against defendants); Exhibit P-54 ¶¶ 10-11

(asserting manufacture, distribution or sale of asbestos-containing products), ¶¶ 12-16 (asserting

joint and several products liability claim); ¶¶ 58-73 (asserting specific allegations involving PPG

and Pittsburgh Corning), and ¶¶ 75-83 (asserting conspiracy, concert of action, and common

enterprise claim among all defendants).

73. Claimants in another suit, the Abernathy petition set forth in Exhibit P-18, have

asserted claims against PPG relating to Pyrocal.  *See* Doc. No. 7825, Tr. 6/4/2010 at 156:1-8,

168:18-169:4.  That petition contains specific allegations that PPG acted in concert with

Pittsburgh Corning.  Exhibit P-18 at ¶¶ 65-76.  By way of example, these include allegations that

"[a]t all material times, PPG and Corning acted in concert with their subsidiary, PCC, in the

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 25 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 25 of 143

research and investigation of the hazards of its products and the health consequences to humans of asbestos dust and fiber inhalation and ingestion." *Id.* at ¶ 67. Abernathy also alleged that "PPG, Corning, and PCC further acted in concert to suppress the information known to them of the hazards of asbestos and to undertake and continue the marketing of the poisonous products well beyond the time any reasonable manufacturer would have suspended sales of the known carcinogen." *Id.* at ¶ 68.  The petition alleged that "PPG and Corning in concert with PCC implemented and began the manufacture of insulation products which injured Plaintiffs," *id.* at ¶ 70, and alleged the creation of dangers to persons exposed to "Unibestos and other such materials." *Id.* at ¶ 74.  The Abernathy petition also contains certain general allegations against the defendants, including allegations regarding joint "suppression" of information, *id.* at ¶ 16, and action in concert and conspiratorial conduct. *Id.* at ¶¶ 23, 24 and 30. The allegations in the Abernathy petition are virtually identical to those in other complaints admitted into evidence. *See* Exhibits P-120 (same ¶¶), P-121 (same ¶¶), P-122 (same ¶¶ other than ¶¶ 16 and 30), P-123 (¶¶ 25, 26, 64, 75, and 71), P-124 (same ¶¶ other than ¶¶ 16 and 30),  P-125 (same ¶¶), P-126 (same ¶¶ other than ¶¶ 16 and 30), and P-127 (same ¶¶ other than ¶¶ 16 and 30).

74. Beyond the allegations in the complaints, claimants have referred to PPG's historical relationship with Pittsburgh Corning in an attempt to establish that PPG had knowledge regarding the hazards associated with asbestos. Tr. 5/5/2004 at 103:22-104:1 (Diggs).

75. PPG has never been found liable for a claim alleging asbestos-related bodily injury as a result of exposure to a product manufactured, distributed, or sold by PPG. Tr. 5/5/2004 at 35:6-9, 20-22 (Seymour), 104:2-5 (Diggs).  Pyrocal is the only asbestos-containing product manufactured, distributed, or sold by PPG that has ever given rise to a settlement payment by

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 26 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 26 of 143

PPG. *Id.* at 104:6-17 (Diggs). The total settlements of Pyrocal claims have amounted to

approximately $2 million over the course of the asbestos litigation against PPG. *Id.* at 104:14-17

(Diggs).

> **F.**   **Asbestos Claims Against Corning**

76. Corning has been named as a defendant in lawsuits by claimants that allege that

Corning is liable for bodily injuries they allegedly sustained as a result of exposure to Pittsburgh

Corning's Unibestos product. These claims are often referred to as "Unibestos" or

"PC-Relationship" claims. Doc. No. 6426 at 38-39; PM Tr. 5/3/2004 at 64:2-7, 79:9-81:3,

83:6-85:15 (Ellis); PM Tr. 5/4/2004 at 12:13-19:21 (Eggers); Exhibits P-5, P-6, P-7, P-8, P-9,

P-10, P-11, P-12, P-13, P-18, P-19, P-120, P-121, P-122, P-123, P-124, P-125, P-126, and P-127.

77. Beginning in 1992, cases alleging personal injuries from exposure to Unibestos were

brought against Corning in Brazoria County, Orange County, and Jefferson County, Texas. At

the time Pittsburgh Corning filed for reorganization under Chapter 11, there were approximately

11 cases, with approximately 11,400 claimants, pending against Corning in these Texas counties

and one case pending in Alabama. PM Tr. 5/4/2004 at 15:22-17:19, 78:7-11 (Eggers); Tr.

5/5/2004 at 230:19-24 (Fitzpatrick); Doc. No. 6426 at 39; Exhibits P-18, P-120, P-121, P-122,

P-123, P-124, P-125, P-126, and P-127.

78. Corning was named as a defendant along with Pittsburgh Corning and PPG in the five

Texas Unibestos cases listed on Exhibit P-19: *Cardwell, et al. v. ACANDS, Inc. et al.; Bailey, et*

*al. v. ACANDS, Inc., et al.; Gilbert v. ACANDS, Inc. et al.; Aaron, et al. v. Aber Insulation, et al;*

*Martin v. ACANDS, Inc., et al.* PM Tr. 5/4/2004 at 17:22-19:21 (Eggers); Exhibit P-19, P-120,

P-121, P-123, and P-125. In those cases Corning is alleged to be the alter ego of Pittsburgh

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 27 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 27 of 143

Corning. *See, e.g.,* Exhibits P-121 ¶ 5(r) ("Corning, Inc., a Pennsylvania [sic] corporation (alter

ego of PPG Industries, Inc. and Pittsburgh Corning Corporation")), ¶ 66 ("PPG and Corning are

the parent corporation of Pittsburgh Corning Corporation"); P-120 ¶¶ 5(r), 66 (same); P-123 ¶¶

12, 63 (same); P-124 ¶¶ 5(m), 66 (same)").

79. As of the Petition Date, Corning was a defendant in Unibestos/PC-Relationship cases

involving approximately 11,400 claimants. Pittsburgh Corning is one of the co-defendants in all

of these cases. PM Tr. 5/4/2004 at 15:25-19:21 (Eggers); Tr. 5/5/2004 at 230:19-24

(Fitzpatrick), Doc. No. 6426 at 39.

80. Asbestos claimants seeking to impose liability on Corning for

Unibestos/PC-Relationship claims have relied upon, *inter alia*, the fact that Corning was a fifty

percent shareholder of Pittsburgh Corning and the fact that employees of Corning were on

Pittsburgh Corning's Board of Directors. PM Tr. 5/4/2004 at 12:18-13:1, 73:14-74:4 (Eggers);

Doc. No. 6426 at 38; P-18 ¶¶ 65-76; P-120 ¶¶ 65-76; P-121 ¶¶ 65-76; P-122 ¶¶ 65-76; P-123 ¶¶

62-73; P-124 ¶¶ 65-76; P-125 ¶¶ 65-76; P-126 ¶¶ 65-76; and P-127 ¶¶ 65-76.

81. Among the several purported legal theories alleged against Corning for Unibestos

liability were: alter ego, piercing the corporate veil, domination and control, concert of action,

common enterprise, aiding and abetting, *respondeat superior*, negligent provision of services,

principal/agent liability, mere instrumentality theory, successor-in-interest, and conspiracy. *See*

PM Tr. 5/3/2004 at 98:4-8 (Ellis); PM Tr. 5/4/2004 at 12:18-13:1, 16:10-17:19, 73:14-74:4

(Eggers); Exhibits P-18, P-19, and P-54; Doc. No. 6426 at 38.

82. Virtually all of the cases against Corning alleging exposure to asbestos-containing

products also include a claim against Pittsburgh Corning for alleged exposure to Unibestos.   PM

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 28 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 28 of 143

Tr. 5/3/2004 at 67:16-68:10, 94:20-95:9 (Ellis); PM Tr. 5/4/2004 at 32:6-13 (Eggers).

83. Corning defended against liability in Unibestos cases and typically moved for summary judgment on the grounds it could not be held liable for injuries allegedly caused by a product manufactured, sold, or distributed by Pittsburgh Corning, that it did not owe a duty to any person claiming exposure to Unibestos, and that it was completely uninvolved in Pittsburgh Corning's manufacture, sale and distribution of Unibestos.  PM Tr. 5/4/2004 at 14:24-15:21, 24:9-25:6, 157:5-7, 158:17-21 (Eggers); Doc. No. 6426 at 39.

84. Although no Unibestos case against Corning ever proceeded to trial, there was (and is) considerable uncertainty as to how Corning would fare at trial in the Texas state courts in these asbestos cases. PM Tr. 5/4/2004 at 24:9-25:6, 158:17-159:2 (Eggers).

85. When Pittsburgh Corning settled an asbestos case, it typically obtained a release that also released Corning with respect to Unibestos claims, with no additional payment by Corning. PM Tr. 5/4/2004 at 24:25-25:3 (Eggers).

86. [Intentionally Omitted].

87. Claimants have alleged that Corning has potential asbestos liability arising out of a product distributed by Corhart Refractories Company ("Corhart").  PM Tr. 5/4/2004 at 26:19-30:4 (Eggers).

88. Corhart was formed in approximately 1927 by Corning and Hartford Empire Company ("Hartford") to manufacture and sell refractory bricks for use in constructing furnaces to make glass products at high temperatures.  Initially, Corning and Hartford each owned fifty percent of the stock of Corhart.  *Id.* at 25:10-25 (Eggers).

89. In the 1950s, Corning acquired all of the outstanding shares of Corhart, and Corhart

28

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 29 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 29 of 143

became a wholly-owned subsidiary of Corning. In 1974, Corhart was dissolved and its business became a division of Corning. In 1985, Corning sold the assets of the Corhart business to an unaffiliated corporation in a management buy-out and, thereafter, Corning no longer had any interest in Corhart's business. *Id.* at 25:21-26:9 (Eggers); Doc. No. 6426 at 41.

90. Claimants in the Abernathy petition set forth in Exhibit P-18 have asserted that such petition includes claims against Corning relating to Corhart. *See* Tr. 6/4/2010 at 156:1-8. That petition contains specific allegations that Corning acted in concert with Pittsburgh Corning. Exhibit P-18 ¶¶ 65-76. By way of example, these include allegations that "[a]t all material times, PPG and Corning acted in concert with their subsidiary, PCC, in the research and investigation of the hazards of its products and the health consequences to humans of asbestos dust and fiber inhalation and ingestion." *Id.* at ¶ 67. Abernathy also alleged that "PPG, Corning, and PCC further acted in concert to suppress the information known to them of the hazards of asbestos and to undertake and continue the marketing of the poisonous products well beyond the time any reasonable manufacturer would have suspended sales of the known carcinogen." *Id.* at ¶ 68. The petition alleged that "PPG and Corning in concert with PCC implemented and began the manufacture of insulation products which injured Plaintiffs," *id.* at ¶ 70, and alleged the creation of dangers to persons exposed to "Unibestos and other such materials." *Id.* at ¶ 74. The Abernathy petition also contains certain general allegations against the defendants, including allegations regarding joint "suppression" of information, *id.* at ¶ 16, and action in concert and conspiratorial conduct. *See id.* at ¶¶ 23, 24 & 30. The allegations in the Abernathy petition are virtually identical to those in other complaints admitted into evidence. *See* Exhibits P-120 (same ¶¶), P-121 (same ¶¶), P-122 (same ¶¶ other than ¶¶ 16 & 30), P-123 (¶¶ 25, 26, 64, 75, and 71),

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 30 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 30 of 143

P-124 (same ¶¶ other than ¶¶ 16 & 30), P-125 (same ¶¶), P-126 (same ¶¶ other than ¶¶ 16 & 30),

and P-127 (same ¶¶ other than ¶¶ 16 & 30).

91. Other complaints assert Corhart claims and claims against the Debtor, and assert a

conspiracy among the defendants.  PM Tr. 5/4/2004 at 32:6-34:1 (Eggers); Exhibit P-53 ¶ 8(aa)

(alleging Corhart's manufacture and sale of asbestos-containing products or products designed to

contain asbestos), ¶ 8(az) (alleging the Debtor's manufacture and sale of asbestos products); ¶ 14

(asserting existence of conspiracy) ¶¶ 16, 18-19 (asserting joint and several products liability

claims against defendants); Exhibit P-54 ¶¶ 10-11 (asserting manufacture, distribution or sale of

asbestos-containing products), ¶¶ 12-16 (asserting joint and several products liability claim), and

¶¶ 75-83 (asserting conspiracy, concert of action, and common enterprise claim among all

defendants).

92. The Debtor did not manufacture, sell, and/or distribute Corhart spacers or any other

non-Unibestos asbestos-containing product described in Section VI.D of the Modified Third

Amended Disclosure Statement filed with the Bankruptcy Court on February 6, 2009, Doc. No.

6426 at 40-42; Am Tr. 5/4/2004 at 48:25-49:7, 90:8-91:2 (Ellis)  .

93. Pittsburgh Corning was named as a co-defendant in 93 percent to 97 percent of the

Corhart cases.  PM Tr. 5/4/2004 at 32:6-34:1 (Eggers); *see* Exhibits P-53 and P-54.

G.    **Cross-Claims**

94. In asbestos cases where Pittsburgh Corning, PPG, Corning, and/or Corhart were

named as defendants, cross-claims were asserted or deemed asserted between and among them

and all defendants.  PM Tr. 5/3/2004 at 136:11-19 (Ellis); PM Tr. 5/4/2004 at 21:18-24:1, 33:3-5

(Eggers); Tr. 5/5/2004 at 105:15-18 (Diggs); Exhibits P-51 ¶ 15, P-60, and P-62 (p.7, ¶ B).

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 31 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 31 of 143

95. PPG and Corning have each filed separate Proofs of Claim in this Chapter 11 Case against Pittsburgh Corning which included claims asserted for contribution and indemnity with respect to asbestos personal injury claims. PM Tr. 5/4/2004 at 20:1-21:7 (Eggers); Tr. 5/5/2004 at 104:24-105:14 (Diggs); Exhibits P-36 and P-103.

### H.   Pittsburgh Corning/PPG Insurance

96. For a period beginning before the time when Pittsburgh Corning began to manufacture Unibestos in 1962, and continuing until 1966, Pittsburgh Corning shared primary insurance with PPG. For a period beginning before the time when Pittsburgh Corning began to manufacture Unibestos in 1962, and continuing until 1986 (when asbestos coverage was no longer available), the Debtor was included as an insured under PPG's excess insurance program. PM Tr. 5/3/2004 at 73:14-23 (Ellis); Tr. 5/5/2004 at 42:8-45:25, 47:15-51:10 (Seymour); Exhibits P-40, P-57, P-57A, and P-57B. Many of these insurers are PPG Participating Insurers and are contributing to the funding of the Asbestos PI Trust. *See* Doc. No. 8928, Plan (Exhibit F – PPG Trust Funding Agreement, Schedules A-D).

97. Most of the $1.2 billion expended by Pittsburgh Corning in the defense and indemnification of asbestos bodily injury claims was paid through the excess insurance program shared with PPG. PM Tr. 5/3/2004 at 106:5-10 (Ellis); Tr. 5/5/2004 at 25:6-26:15, 35:23-36:16, 55:5-24 (Seymour); Exhibits P-40, P-57A, and P-57B.

98. Certain insurers subscribed to or issued certain pre-July 1, 1981, excess insurance policies ("Pre-7/1/81 PPG Policies") and certain post-July 1, 1981, excess insurance policies ("Post-7/1/81 PPG Policies") that include both PCC and PPG (collectively, the "PPG Excess Policies") as insureds. Tr. 5/5/2004 at 36:8-10, 42:22-43:9, 51:16-53:12 (Seymour); *see*

31

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 32 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 32 of 143

*also* Exhibits P-40 (PPG coverage chart), P-57A, and P-57B.

99. PPG secured these policies for its own benefit and for the benefit of PCC. Tr. 5/5/2004 at 104:22-23 (Diggs). Filing for bankruptcy protection allowed Pittsburgh Corning to preserve the remaining coverage under the Pre-7/1/81 PPG Policies while also providing an opportunity to negotiate a settlement of its disputed claim to coverage under the Post-7/1/81 PPG Policies. PM Tr. 5/3/2004 at 112:14-21, 113:25-114:6 (Ellis).

100. The Post-7/1/81 PPG Policies contain a statement that "this Policy shall not apply ... (4) in respect of Pittsburgh Corning Corporation, to all claims arising out of the manufacture and/or distribution of Asbestos products or products containing Asbestos fibre, and all claims arising out of Asbestosis or any other Asbestos-related injuries or diseases." Tr. 5/5/2004 at 41:9-24 (Seymour); Exhibit P-57C at BNKR 00023065; PM Tr. 5/3/2004 at 75:7-12 (Ellis).

101. Pittsburgh Corning has taken the position that the foregoing provision is not enforceable because it was not approved by the Pennsylvania insurance regulators. PM Tr. 5/3/2004 at 75:13-19 (Ellis); Tr. 5/5/2004 at 41:25-42:7.

102. Subject to their applicable terms and conditions, Pittsburgh Corning asserts that the PPG Excess Policies potentially provide "products/completed operations" coverage (to the extent that the products/completed operations limits have not been exhausted by PCC) and non-products coverage. Tr. 5/5/2004 at 55:5-58:1 (Seymour); Exhibits P-40, P-57A, and P-57B.

103. As of the Petition Date, Pittsburgh Corning asserts that the Pre-7/1/81 PPG Policies had $250 to $300 million of unexhausted products/completed operations coverage limits. PM Tr. 5/3/2004 at 112:14-19 (Ellis); Tr. 5/5/2004 at 55:5-24 (Seymour).

104. As of the Petition Date, Pittsburgh Corning asserts that the Post-7/1/81 PPG Policies

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 33 of 100
Case 00-22876-TPA    Doc 9443-2    Filed 05/24/13    Entered 05/24/13 19:18:36    Desc
Corrected Order to fix Typo     Page 33 of 143

(net of insolvencies) had approximately $1.122 billion in unexhausted products/completed operations coverage limits.  Exhibits P-40, P-57A, and P-57B.

105. Corning has given notice of a claim to coverage under Pre-7/l/81 PPG Policies and Post-7/l/81 PPG Policies under which Pittsburgh Corning is also insured.  PM Tr. 5/4/2004 at 36:10-23, 37:6-25 (Eggers), Exhibits P-35, P-57A, and P-57B.

106.  The basis of Corning's claim to coverage under certain of those policies is that "insured" is defined to include shareholders of the insured, and Corning is a shareholder of Pittsburgh Corning.  PM Tr. 5/4/2004 at 38:1-6 (Eggers); *see, e.g.,* Exhibits P-57A at 00018926, 00019022, 00020341, and 00020373, and P-57B.

107. Other  policies contain language indicating that "Named Insured" includes "subsidiary, associated, affiliated companies or owned and controlled companies." *See, e.g.,* Exhibit P-57A at BNKR 00025922, 00026034, 00026071, and 00026215.

108. Corning has given notice of a claim to coverage under those policies as well. Exhibits P-35, P-57A, and P-57B.

109. PPG asserts that any successful claim for coverage by PPG or Corning against the products/completed operations limits of the relevant Pre-7/1/81 PPG Policies or Post-7/l/81 PPG Policies under which Pittsburgh Corning is also insured could deplete the products coverage available to Pittsburgh Corning or to which Pittsburgh Corning has asserted a claim.  Tr. 5/5/2004 at 55:5-56:23 (Seymour); Exhibits P-20, P-57A, and P-57B.  By way of example, the PPG Policy in Exhibit 57C provides that "[t]he inclusion or addition hereunder of more than one Assured shall not operate to increase Underwriters' limits of liability beyond those set forth in the Declarations."  Exhibit P-57C at BNKR 00023068.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 34 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 34 of 143

110. During the course of this Bankruptcy Case, the Debtor has reached settlements with the PCC Settled Insurers.  Those settlement agreements generally call for the PCC Settled Insurer to contribute assets to the Asbestos PI Trust, directly or via the QSF, in many cases in contemplation of, *inter alia,* the protection afforded an Asbestos Protected Party under the Plan. Plan at Exhibit N (identification of PCC Insurance Settlement Agreements); Docket Nos. 879, 970, 1133, 1177, 1271, 1272, 1366, 1367, 1501, 1502, 1503, 1565, 1693, 1694, 1695, 1696, 1768, 1896, 6410, and 6785.

111. Suits against the PPG Entities for Claims or Demands relating to asbestos or asbestos-containing products, other than Claims or Demands against the PPG Entities for PPG Asbestos Premises Claims, could reduce the amount of insurance coverage that would otherwise be available to the Debtor or the Asbestos PI Trust or the amount of insurance coverage to which the Debtor has asserted a right to coverage, and therefore there is an identity of interest of the Debtor and the PPG Entities in enjoining Channeled Asbestos PI Trust Claims against the PPG Entities.  PM TR. 5/3/2004 at 73:14-23, 75:3-19, 76:8-77:4 (Ellis); Tr. 5/5/2004 at 40:19-54:21, 55:5-58:1 (Seymour), Exhibits P-20, P-40, P-57A, P-57B, and P-57C; *see* Plan §8.1.20.  This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the PPG Insurers in any coverage litigation regarding the insurance coverage rights[11] or obligations of the PPG Insurers.

112. Suits against the Corning Entities for Claims or Demands relating to asbestos or asbestos-containing products, other than Claims or Demands against the Corning Entities for

---

[11] "Rights" is used throughout this Opinion and Order in its broadest and unlimited sense to include defenses, claims, and any and all other entitlements the parties to the insurance policies and settlements, as applicable, have.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 35 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 35 of 143

Corning Asbestos Premises Claims, could reduce the amount of insurance coverage that would otherwise be available to the Debtor or the Asbestos PI Trust or the amount of insurance coverage to which the Debtor has asserted a right to coverage, and therefore there is an identity of interest of the Debtor and the Corning Entities in enjoining Channeled Asbestos PI Trust Claims against the Corning Entities.  This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the Corning Insurers in any coverage litigation regarding the insurance coverage rights or obligations of the Corning Insurers.

## I.    Corning Insurance

113. For the period from 1962 to 1974, Corning procured excess insurance policies ("Affiliate Policies"), against which Pittsburgh Corning has provided notice of a claim based upon its assertion that those policies contain language which potentially provides coverage to Corning's affiliates.  *See* PM Tr. 5/4/2004 at 35:22-36:9 (Eggers); Exhibits P-21, P-141.

114. Pittsburgh Corning has asserted that because Corning has been a fifty percent shareholder of Pittsburgh Corning and has had board representation at Pittsburgh Corning, Pittsburgh Corning is an "affiliated" or "associated" company of Corning and thus is insured under its Affiliate Policies.  PM Tr. 5/3/2004 at 77:25-78:7 (Ellis); PM Tr. 5/4/2004 at 35:22-36:9 (Eggers).

115. As examples, Pittsburgh Corning points to some of the Affiliate Policies that define "Named Assured" to include Corning and any Corning "subsidiary, associated, affiliated companies or owned and controlled companies ..."  PM Tr. 5/3/2004 at 77:5-24 (Ellis); *see, e.g.,* Exhibit P-21 (ninth page), Exhibit P-141 (London Policy Nos. 61577 (at CI 04440) and 6429 (at

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 36 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 36 of 143

CI 04501)) ("Assured is amended to read as follows: Corning Glass Works ... and/or subsidiary, associated, affiliated companies or owned and controlled as now or hereafter constituted.").

116. The Corning Affiliate Policies also include as a named insured Corning and "subsidiary, associated, affiliated companies or owned and controlled companies" and likewise define as insureds those who are shareholders of the named insured. *See, e.g.,* Exhibit P-2l (seventeenth page, ¶ 1(a)) ( "The unqualified word 'Assured,' wherever used in this policy, includes not only the Named Assured but also: (a) any officer, director, stockholder, partner or employee of the Named Assured ..."); *see also, e.g.,* Exhibit P-141 (Home Policy Nos. HEC 9544023 (at CI045 12) and HEC 9559388 (at CI 04596)) ("The unqualified word 'Insured', wherever used in this policy, includes not only the Named Insured but also: (a) any officer, director, stockholder, partner or employee of the Named Insured ....").

PPG, Pittsburgh Corning asserts, could claim that under the Affiliate Policies, it is entitled to coverage as a "stockholder " of Pittsburgh Corning, if Pittsburgh Corning is a Named Assured.

In addition, Corhart Refractories Company is listed as a named insured on a number of policies issued to Corning, including Affiliate Policies. *See e.g.,* Exhibit P-141 (London Policy Nos. 61576 (at CI 04420), 61577 (at CI04440), and 64249 (at CI 04501)).

117. Pittsburgh Corning asserts that any successful claim for coverage by Corning, Corhart, or PPG against the products/completed operations limits of the Affiliate Policies could deplete the products coverage to which Pittsburgh Corning has asserted a claim. PM Tr. 5/4/2004 at 35:3-21 (Eggers). However, as we previously ruled in our 2011 Opinion, 453 B.R. at 596, citing our 2006 Opinion, 417 B.R. at 299-300, "[T]o the extent the argument is that the

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 37 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 37 of 143

channeling injunction is proper with respect to these suits as to Corning because there will be an

impact on insurance coverage as a result of Corhart claims, ... it is evident that such an impact

will not occur unless a separate contribution or indemnity action is brought.'' 417 B.R. at

299–300 (internal citations omitted). Thus, ''[e]ven though at least some of the suits against

Corhart name PCC and PPG, Corning is not named and a separate suit against Corning could be

required to establish Corning's liability or to affect the insurance shared between PCC and

Corning.''

118. Pittsburgh Corning cites, by way of example, the policy set forth as Exhibit P-21

which provides that "[t]he inclusion or addition hereunder of more than one Assured shall not

operate to increase Underwriters' limit of liability." Exhibit P-21 (seventeenth page) (Umbrella

Policy Form at 2).

## IV.  APPOINTMENT OF THE FCR AND HIS DUE DILIGENCE

119. Lawrence Fitzpatrick was appointed as the FCR to ensure that future claimants were

treated fairly and equitably in the process of developing the Plan and related documents. Tr.

5/5/2004 at 138:1-5 (Fitzpatrick).

120. Mr. Fitzpatrick has more than thirty years of experience handling asbestos-related

claims, and nearly ten years experience representing future claimants in asbestos bankruptcy

matters. Tr. 5/5/2004 at 139:1-142:7 (Fitzpatrick); Tr. 6/3/2010 at 102:3-21, 103:18-106:1

(Fitzpatrick); P-146 (Fitzpatrick curriculum vitae).

121. The FCR retained Analysis Research and Planning Company ("ARPC") and, in

particular, Dr. Thomas Florence, to assist in evaluating the asbestos claims history of the Debtor,

PPG, and Corning. Tr. 5/5/2004 at 146:4-25 (Fitzpatrick); Tr. 6/3/2010 at 106:9-20

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 38 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 38 of 143

(Fitzpatrick),

122. ARPC investigated and advised the FCR as to the number, timing, and amounts of future claims against the Debtor, PPG, and Corning.  Tr. 5/5/2004 at 146:19-20 (Fitzpatrick); Tr. 6/3/2010 at 106:21-24 (Fitzpatrick).

123. The FCR also retained a financial advisor, Bederson and Company.  Tr. 6/3/2010 at 106:25-107:7 (Fitzpatrick).

124. The FCR and his advisors reviewed Pittsburgh Corning's pre-petition asbestos settlement and litigation history, and the nature and extent of the asbestos personal injury claims pending against the Debtor as of the Petition Date.  Tr. 6/3/2010 at 107:8-16 (Fitzpatrick).

125. In addition, the FCR and his advisors reviewed the history of PC-related and other asbestos claims against PPG and Corning.  Tr. 6/3/2010 at 107:8-108:3 (Fitzpatrick); Tr. 5/5/2004 at 147:20-150:8 (Fitzpatrick).

126. After conducting due diligence with respect to the asbestos liability of the Debtor and its Shareholders for Asbestos PI Trust Claims, the FCR determined that absent the Plan, the Debtor would be subject to substantial future asbestos-related demands.  Tr. 5/5/2004 at 147:14-19 (Fitzpatrick).

127. The FCR has, in the fulfillment of his duties, considered the likelihood, merits, and value of Channeled Asbestos PI Trust Claims against the PPG Entities in combination with the likelihood, merits, and value of such claims against the Debtor.  Tr. 5/5/2004 at 146:4-23, 147:14-19,149:14-21,149:25-150:5 (Fitzpatrick); Tr. 6/3/2010 at 107:8-108:3 (Fitzpatrick); *see* Plan §8.1.24.

128. The FCR has, in the fulfillment of his duties, considered the likelihood, merits, and

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 39 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 39 of 143

value of Channeled Asbestos PI Trust Claims against the Corning Entities in combination with

the likelihood, merits, and value of such claims against the Debtor. Tr. 5/5/2004 at 146:4-23,

147:14-19, 149:14-21, 149:25-150:5 (Fitzpatrick); Tr. 6/3/2010 at 107:8-108:3 (Fitzpatrick); *see*

Plan §8.1.34.

129. Following negotiation of the Modified Third Amended Plan, which, among other

things, narrows and delineates the types of claims against PPG and Corning that will be included

in the definition of "Channeled Asbestos PI Trust Claims" (as compared with the Second

Amended Plan), the Plan Proponents and Plan Supporters moved for an order confirming that to

the extent that the September 11, 2003, Order (Doc. 2503, signed on 9/11/03 and docketed on

9/12/03) expanded the scope of the FCR's representation to include claims not eventually

encompassed by the Asbestos Permanent Channeling Injunction of the Modified Third Amended

Plan, the FCR will, upon the Effective Date of the Plan, have satisfied and been discharged from

any and all duties and responsibilities with respect to claims other than Channeled Asbestos PI

Trust Claims. Joint Motion to Discharge Lawrence Fitzpatrick as Legal Representative with

Respect to Future Claims Not Subject to the Asbestos Permanent Channeling Injunction, Doc.

7700 ("Joint Motion to Discharge").

130. On June 9, 2010, the Court granted the Joint Motion to Discharge, Doc. No. 7801,

ordering that: " ... the record in this matter reflect[s] that in connection with his appointment in

this case, Lawrence Fitzpatrick represents the future holders of Channeled Asbestos PI Trust

Claims (as such term is defined in the Modified Third Amended Plan) only with respect to such

Channeled Asbestos PI Trust Claims; and ... that the record in this matter reflect[s] that with

respect to claims encompassed by the Expansion Order, other than Channeled Asbestos PI Trust

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 40 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 40 of 143

Claims, Lawrence Fitzpatrick upon the Effective Date will have satisfied and discharged any and all duties in this case." The Order further provided that the Orders at Doc. Nos. 713 and 2503, *see* ¶ 7, *supra*, remained in effect otherwise.

131. The FCR represents and will continue after confirmation to represent the interests of holders of Channeled Asbestos PI Trust Claims that will be asserted in the future. *See* Doc. No. 8928, Plan, Exhibit A (Asbestos PI Trust Agreement) at §6.1 and Exhibit B (TDP) at §3.1.

132. The FCR's due diligence continued during the negotiation of the Modified Third Amended Plan. Tr. 6/3/2010 at 108:4-6 (Fitzpatrick).

133. With respect to the Modified Third Amended Plan, the FCR considered the types of claims subject to channeling (including the differences between the Second and Third Amended Plans), Tr. 6/3/2010 at 108:7-109:12 (Fitzpatrick); the identity of the parties to be protected by the Asbestos Permanent Channeling Injunction, Tr. 6/3/2010 at 109:13-110:18 (Fitzpatrick), and the respective trust funding to be provided by or on behalf of the Asbestos Protected Parties, including, but not limited to, Pittsburgh Corning, the PCC Settled Insurers, PPG, the PPG Participating Insurers, Corning and the Corning Protected Insurers (now referred to as the Corning Insurers). Tr. 6/3/2010 at 111:8-113:7 (Fitzpatrick), including the differences between funding under the Second Amended Plan and the Modified Third Amended Plan. Tr. 6/3/2010 at 113:8-114:1 (Fitzpatrick).

134. The FCR concluded that the respective contributions to be provided by or on behalf of Pittsburgh Corning, the PCC Settled Insurers, PPG, Corning, the PPG Participating Insurers and the Corning Insurers were contingent upon Asbestos Protected Parties receiving the protection of the Asbestos Permanent Channeling Injunction and the releases proposed under the

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 41 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 41 of 143

Modified Third Amended Plan. Tr. 6/3/2010 at 114:2-11 (Fitzpatrick).

135. The FCR further concluded that the Plan's treatment of future claims vis-a-vis the nondebtor Asbestos Protected Parties, was fair and equitable to future claimants. Tr. 6/3/2010 at 114:22-115:3 (Fitzpatrick). The Court agrees. This paragraph shall be read in conjunction with ¶ 389.

136. Based on his due diligence, the FCR has concluded that the Plan and the Asbestos PI Trust are fair and equitable to the future holders of Channeled Asbestos PI Trust Claims and provide reasonable assurance that the Asbestos PI Trust will value and be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner. Tr. 6/3/2010 at 101:19-102:2 (Fitzpatrick). The Court agrees.

## VI.    PLAN PROVISIONS

### A.    General Plan Overview

137. The Plan provides for the creation of the Pittsburgh Corning Asbestos PI Trust (the "Asbestos PI Trust"). Doc. No. 8928, Plan §9.1.1, Exhibit A (Asbestos PI Trust Agreement).

138. The purpose of the Asbestos PI Trust is to assume all liabilities for and with respect to all Channeled Asbestos PI Trust Claims, and to use the assets contributed to it by Pittsburgh Corning, PPG, the PPG Participating Insurers, the PCC Settled Insurers, and Corning, and any other assets that may be contributed to or acquired by the Asbestos PI Trust from time to time, and the proceeds and income from all such assets, to resolve all Channeled Asbestos PI Trust Claims. Doc. No. 8928, Plan, Exhibit A (Asbestos PI Trust Agreement) at §1.2. Class 5, the Channeled Asbestos PI Trust Claims, will be dealt with through the Asbestos PI Trust and the Trust Distribution Procedures ("TDP") which implement the Trust.

41

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 42 of 100
Case 00-22876-TPA    Doc 9443-2    Filed 05/24/13    Entered 05/24/13 19:18:36    Desc
Corrected Order to fix Typo    Page 42 of 143

139. The Plan also provides for (1) payment of 90 percent of the Allowed Amount of prepetition general unsecured claims for goods and services rendered in the ordinary course of the Debtor's business operations, Plan §3.2.4 (Class 4-A); (2) payment in full of workers compensation claims against the Debtor, Plan §3.2.4 (Class 4-B); (3) the assumption by the Reorganized Debtor of all rights and obligations under the Debtor's retiree health and life insurance benefit plans, Plan §3.2.3 (Class 3-A); (4) payment in full of benefits earned through the termination date of the Debtor's Salaried Pension Plan (December 31, 2006) and through the benefit-accrual cessation date (December 31, 2007) of the Debtor's Hourly Pension Plan, Plan §3.2.3 (Class 3-B); (v) payment in full of priority tax and other priority claims (Plan §3.2.1); and (v) payment in full of secured claims under the Debtor's DIP Facility (Plan §3.2.2).

140. The Plan provides for the cancellation of Equity Interests. Doc. No. 8928, Plan §3.2.6.

141. Except for the assets being contributed to the Asbestos PI Trust (as described below) and for "Debtor-Released Claims," title to all the Debtor's assets and properties and interests in property will be vested in the Reorganized Debtor under the Plan. Doc. No. 8928, Plan §11.10.

142. Upon the Plan Effective Date, 100 percent of the Reorganized PCC Common Stock will be issued to the Asbestos PI Trust. Doc. No. 8928, Plan §9.1.3.

**B.    Channeled Asbestos PI Trust Claims**

143. Under the Plan, "Channeled Asbestos PI Trust Claim" means an "Asbestos PI Trust Claim" against an "Asbestos Protected Party." Plan §1.1 (definitions).  Accordingly, a claim must satisfy both elements of the definition in order to be channeled.

144. "Asbestos Protected Party" is defined in §1.1 of the Plan, as modified by the

42

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 43 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 43 of 143

Technical Amendments at Doc. No. 9402.[12]

_____

[12]Asbestos Protected Party is defined in full in the Technical Amendments filed on May 15, 2013, Doc. No. 9402, as:

> Any of the following Entities:
> (a) the Debtor, Reorganized PCC and/or the PCC-Affiliated Parties;
> (b) the PPG Entities, the PPG Affiliates and the PPG-Affiliated Parties, with respect to Asbestos PI Trust Claims that arise, in whole or in part, out of exposure to:
> (1) Unibestos, or any other asbestos or asbestos-containing products manufactured, sold and/or distributed by the Debtor, or asbestos on or emanating from any PCC premises; or
> (2) any other alleged asbestos or asbestos-containing product to the extent that a claimant is alleging or seeking to impose liability, directly or indirectly, for the conduct of, claims against or demands on the Debtor by reason of any of the PPG Entities', the PPG Affiliates', the PPG-Affiliated Parties' or the PPG Participating Insurer Entities': (i) ownership of a financial interest in the Debtor; (ii) involvement in the management of the Debtor, or service as an officer, director or employee of the Debtor or a related party; (iii) provision of insurance to the Debtor or a related party; or (iv) involvement in a financial transaction affecting the financial condition of the Debtor or a related party;
> (c) the PPG Participating Insurer Entities, in their capacity as such and/or as issuers of PPG Participating Insurance Policies and policies issued to or covering the Debtor;
> (d) the PPG Non-Participating Insurer Entities, in their capacity as such and/or as issuers of PPG Non-Participating Insurance Policies and policies issued to or covering the Debtor;
> (e) the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties and the Corning Insurers, in their capacity as such and/or as issuers of the Corning Insurance Policies, with respect to Asbestos PI Trust Claims that arise, in whole or in part, out of exposure to:
> (1) Unibestos, or any other asbestos or asbestos-containing products manufactured, sold and/or distributed by the Debtor, or asbestos on or emanating from any PCC premises; or
> (2) any other alleged asbestos or asbestos-containing product to the extent that a claimant is alleging or seeking to impose liability, directly or indirectly, for the conduct of, claims against or demands on the Debtor by reason of any of the Corning Entities', the

(continued...)

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 44 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 44 of 143

145. The definition of Asbestos Protected Party in the Plan limits the types of Asbestos

PI Trust Claims as to which PPG and Corning can be "Asbestos Protected Parties," and therefore

---

[12](...continued)

Corning Affiliates', the Corning-Affiliated Parties' or the Corning Insurers': (i) ownership of a financial interest in the Debtor; (ii) involvement in the management of the Debtor, or service as an officer, director or employee of the Debtor or a related party; (iii) provision of insurance to the Debtor or a related party; or (iv) involvement in a financial transaction affecting the financial condition of the Debtor or a related party;

(f) without limiting any protection afforded by subsection (c) above, and for the avoidance of doubt, the PCC Settled Insurer Entities, in their capacity as such and/or as issuers of the PCC Settled Insurance Policies;

(g) [Intentionally Omitted];

(h) [Intentionally Omitted];

(i) any Entity to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtor, Reorganized PCC, or the Asbestos PI Trust on account of Asbestos PI Trust Claims by reason of one or more of the following:

(1) such Entity's involvement in the management of the Debtor, Reorganized PCC or an Affiliate of the Debtor or any predecessor in interest of the Debtor, Reorganized PCC, or an Affiliate of the Debtor, including PPG and Corning;

(2) such Entity's ownership of a financial interest in the Debtor, Reorganized PCC, or a past or present Affiliate of the Debtor, or any predecessor in interest of the Debtor, Reorganized PCC, or an Affiliate of the Debtor, including PPG and Corning;

(3) such Entity's service as an officer, director, or employee of the Debtor, Reorganized PCC, or predecessor in interest and/or Affiliate of the Debtor, including PPG and Corning;

(4) such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition of the Debtor, Reorganized PCC, or a predecessor in interest and/or Affiliate of the Debtor, including PPG and Corning.

The Corning Parties and the Corning Insurers are not Asbestos Protected Parties among themselves with respect to Reserved Claims.

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 45 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 45 of 143

limits the extent to which an "Asbestos PI Trust Claim" against PPG or Corning can be a

"Channeled Asbestos PI Trust Claim."

146. With respect to claims arising from exposure to Unibestos or any other asbestos or

asbestos-containing products manufactured, sold, and/or distributed by the Debtor, or asbestos

on or emanating from any Pittsburgh Corning premises, PPG and Corning are Asbestos

Protected Parties. With respect to claims arising from exposure to any other asbestos or

asbestos-containing products, however, PPG and Corning are Asbestos Protected Parties only to

the extent that the claimant in asserting such claim alleges or seeks to impose liability, directly or

indirectly, for the conduct of, claims against, or demands on the Debtor by reason of certain

specified circumstances. Plan §1.1 (definition of Asbestos Protected Party, parts (b) and (e)).

147. Specifically, paragraph (b) of the definition of "Asbestos Protected Party" provides

that the PPG Entities, the PPG Affiliates, and the PPG-Affiliated Parties are Asbestos Protected

Parties "with respect to Asbestos PI Trust Claims that arise, in whole or in part, out of exposure

to":

> (1) Unibestos, or any other asbestos or asbestos-containing
> products manufactured, sold and/or distributed by the Debtor, or
> asbestos on or emanating from any PCC premises; or
>
> (2) any other alleged asbestos or asbestos-containing product to the
> extent that a claimant is alleging or seeking to impose liability,
> directly or indirectly, for the conduct of, claims against or demands
> on the Debtor by reason of any of the PPG Entities', the PPG
> Affiliates', the PPG-Affiliated Parties' or the PPG Participating
> Insurer Entities': (i) ownership of a financial interest in the Debtor;
> (ii) involvement in the management of the Debtor, or service as an
> officer, director or employee of the Debtor or a related party; (iii)
> provision of insurance to the Debtor or a related party; or (iv)
> involvement in a financial transaction affecting the financial
> condition of the Debtor or a related party.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 46 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 46 of 143

148. Similarly, paragraph (e) of the definition of "Asbestos Protected Party" provides that

the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties, and the Corning

Insurers, in their capacity as such and/or as issuers of the Corning Insurance Policies, "with

respect to Asbestos PI Trust Claims that arise, in whole or in part, out of exposure to":

> (1) Unibestos, or any other asbestos or asbestos-containing
> products manufactured, sold and/or distributed by the Debtor, or
> asbestos on or emanating from any PCC premises; or

> (2) any other alleged asbestos or asbestos-containing product to the
> extent that a claimant is alleging or seeking to impose liability,
> directly or indirectly, for the conduct of, claims against or demands
> on the Debtor by reason of any of the Corning Entities', the
> Corning Affiliates', the Corning-Affiliated Parties' or the Corning
> Insurers': (i) ownership of a financial interest in the Debtor; (ii)
> involvement in the management of the Debtor, or service as an
> officer, director or employee of the Debtor or a related party; (iii)
> provision of insurance to the Debtor or a related party; or (iv)
> involvement in a financial transaction affecting the financial
> condition of the Debtor or a related party.

149. The definition of "Channeled Asbestos PI Trust Claim" further provides, in part,

that "Channeled Asbestos PI Trust Claims do not include any Reserved Claims, any PPG

Coverage Claims nor any Non-Derivative PPG/Corning Claims."

150. The definition of "Non-Derivative PPG/Corning Claim" provides:

> A Non-Derivative PPG/Corning Claim is an independent Claim
> against a PPG Entity, PPG Affiliate, PPG-Affiliated Party, Corning
> Entity, Corning Affiliate, or Corning-Affiliated Party or Corning
> Insurer (collectively, PPG/Corning) that alleges exposure to
> Pyrocal (or any other PPG product) or to Corhart spacers (or any
> Corning product) and that is wholly unrelated to the Debtor. For
> the avoidance of doubt, a Non-Derivative PPG/Corning Claim is
> any product Claim against PPG/Corning that does not involve
> Unibestos or other asbestos or asbestos-containing product
> manufactured, sold, and/or distributed by the Debtor, unless such
> Claim is a PCC Conspiracy Theory Claim or by pleading,
> evidence, proof, allegation, proffer of evidence or otherwise seeks

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 47 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 47 of 143

to impose liability on PPG/Corning based on the liability of PCC
or the conduct of PCC.  For the further avoidance of doubt, a
Claim against PPG/Corning that involves asbestos on or emanating
from any PCC premises is excluded from this definition.

151. The definition of "PCC Conspiracy Theory Claim" provides:

A PCC Conspiracy Theory Claim is a Claim that seeks to impose
liability on PPG/Corning for the conduct of, claims against or
demands on PCC in which PPG or Corning is alleged to be liable
based on allegations of conspiracy, alter ego, piercing the
corporate veil, domination and control, concert of action, common
enterprise, aiding and abetting, respondeat superior, negligent
provision of services, principal and agent, successor in interest, or
other theories of liability involving PCC.

152. The express exception of Non-Derivative PPG/Corning Claims from the definition

of Asbestos Permanent Channeling Injunction makes clear that an independent claim that alleges

exposure to Pyrocal (or any other PPG product) or Corhart spacers (or any Corning product) and

is wholly unrelated to the Debtor will not be channeled.

153. The provisions at the end of the definition of Non-Derivative PPG/Corning Claim,

prefaced by "For the avoidance of doubt …," make clear, however, that products claims against

PPG/Corning that do not involve Unibestos or other asbestos or asbestos-containing products

manufactured, sold, and/or distributed by the Debtor can be channeled if they involve the

circumstances set forth in those provisions, including if they are PCC Conspiracy Theory

Claims. The inclusion of such provisions is important to prevent evasion of the Asbestos

Permanent Channeling Injunction through artful pleading or proof implicating the Debtor and

PPG/Corning's §524(g)(4)(A)(ii)(I-IV) relationships to the Debtor.

154. As noted above, Channeled Asbestos PI Trust Claims do not include "Reserved

Claims," which is defined as:

47

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 48 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 48 of 143

> Any past, present or future claims, rights, remedies, liabilities,
> demands, defenses and/or causes of action by any of the Corning
> Parties, and/or their insurers (in their capacity as insurers of the
> Corning Parties) in connection with the Corning Insurance Policies
> and/or the Other Corning Policies including, but not limited to, any
> claims or demands for defense, indemnity, contribution, bad faith,
> breach of contract, reimbursement, Corning Trust Contribution
> Recovery Claims and/or extra-contractual remedies. Reserved
> Claims shall not include any claims for contribution, indemnity,
> reimbursement, equitable subrogation, or similar claims-over by a
> Corning Non-Stipulating Insurer against a Corning Stipulating
> Insurer in connection with Corning Trust Contribution Recovery
> Claims.

Plan §1.1 (definition of "Reserved Claims").

155. The sole and exclusive remedy on account of Channeled Asbestos PI Trust Claims shall be against the Asbestos PI Trust, and no such Claims or Demands may be asserted against the Debtor, Reorganized PCC, or any Asbestos Protected Party, directly or indirectly, and should a legal action based on or arising from any Channeled Asbestos PI Trust Claim be commenced directly against any Asbestos Protected Party, the Asbestos PI Trust shall, upon reasonable notice, execute appropriate legal documents stipulating to the substitution of the Asbestos PI Trust as a party defendant, or should such substitution not be permitted under applicable laws or court rules, the joinder of the Asbestos PI Trust as a party defendant in any federal or state action as permitted by applicable law.  *See* Doc. No. 8928, Plan, Article IV and Exhibit A (Asbestos PI Trust Agreement) at §1.4(f); *see* Plan §8.1.4.

## C.   **Funding of the Asbestos PI Trust**

156. We find that the contributions to the Trust are reasonable.  The liability of PPG and Corning for the conduct of or claims against the Debtor is disputed.  Further, various insurance settlements were approved by this Court and Mt. McKinley has a prepetition settlement.  If these

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 49 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 49 of 143

disputes were to be litigated, the result is unknowable. Thus, the settlements represented by the

PPG and Corning Trust Contributions and the insurer settlements approved by this Court are

reasonable. Notwithstanding this finding that the settlements are reasonable for purposes of Plan

confirmation, nothing in those settlements, the Plan, the Plan Documents, these Findings of Fact

and Conclusions of Law or the Confirmation Order are an adjudication of the merits of any

dispute for insurance coverage purposes.

In its motion for reconsideration Mt. McKinley argues that the PPG and Corning Trust

Funding Agreements are not signed and therefore binding commitments to fund the Plan do not

exist. However, the obligation to fund is dependent on entry of a final nonappealable order

confirming the Plan. Thus, any commitment to fund is conditional on occurrence of that event

and only those parties who do fund will receive the benefit of the channeling injunction.

### 1. The Pittsburgh Corning Contribution

157. Under the Plan, the Debtor and/or the PCC Settled Insurers will pay or contribute

the following to the Asbestos PI Trust:

> a. Proceeds of insurance policies totaling more than $290 million,
> consisting of amounts already collected and paid into the Interim
> Qualified Settlement Fund, and amounts which insurers have
> agreed or are obligated to pay after confirmation of the Plan
> pursuant to any Pre-1981 PCC Settlement Agreement or PCC
> Insurance Settlement Agreement. Doc. No. 8928 Plan, §1.1
> (definitions of "PCC Settled Insurer Entities" and "PCC Settled
> Insurers") and Exhibit N (identification of PCC Insurance
> Settlement Agreements).

> b. The Debtor's interest in all amounts in the qualified settlement
> fund established by this Court's order dated December 10, 2004,
> (relating to KWELMB), totaling more than $28,837,000 as of
> February 28, 2013.

> c. The Debtor's insurance rights against state insurance guarantee

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 50 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 50 of 143

associations and insolvent insurers. (*See* Plan definition of "Assigned Claims"); and

d. The Debtor's and the Reorganized Debtor's claims for contribution or other causes of action in connection with any Asbestos PI Trust Claim, except for (i) Debtor-Released Claims, (ii) any such claims against the PPG Entities, the PPG Affiliates, the PPG-Affiliated Parties, the PPG Participating Insurer Entities, the PCC Settled Insurers (as to Claims released by the Debtor), the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties, and the Corning Insurers and (iii) any such claims to be released by the Debtor in the Insurance Claims Agreement. Doc. No. 8928, Plan §9.1.3; Plan, Exhibit A (Trust Agreement) at §1.3; Tr. 6/3/2010 at 111:8-21 (Fitzpatrick).

158. The Asbestos Permanent Channeling Injunction, as applied to Channeled Asbestos PI Trust Claims against the PCC Settled Insurer Entities, is essential and necessary to the Debtor's reorganization because the PCC Settled Insurers would not be willing to make the payments specified in the PCC Insurance Settlement Agreements without the protection provided by the Asbestos Permanent Channeling Injunction. This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the Corning Insurers in any coverage litigation regarding the insurance coverage rights or obligations of the Corning Insurers. Doc. No. 8928, Plan, Exhibit N (list of PCC Insurance Settlement Agreements); *see* Plan §8.1.45.

## 2.   The PPG Trust Contribution

159. Under the Plan, the "PPG Trust Contribution" consists of the contributions to the Asbestos PI Trust made by and/or on behalf of the PPG Entities, the PPG Affiliates, the PPG Affiliated Parties, the PPG Participating Insurer Entities and the PPG Non-Participating Insurer Entities, as set forth in the PPG Trust Funding Agreement. Doc. No. 8928, Plan §1.1 (definition of "PPG Trust Contribution ") and Exhibit F (PPG Trust Funding Agreement).

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 51 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 51 of 143

a.    **The PPG Contributions**

160. Under the Plan, PPG will contribute the following to the Asbestos PI Trust:

a. $824,850,360 in a series of annual cash payments (subject to a pre-payment discount of 5.5. percent per annum) beginning on the Funding Effective Date;

b. 1,388,889 restricted shares of PPG common stock, or its cash equivalent, whose value on May 28, 2010, was over $88,980,000 and on April 5, 2013, was over $182,958,000;

c. Relinquishment of PPG's claims to shared insurance proceeds in the Debtor's Interim Qualified Settlement Fund and in the December 10, 2004, KWELMB Qualified Settlement Fund (of which PPG's share was over $25,000,000, plus interest). *See* Exhibits P-150, P-151, and P-152;

d. Relinquishment of any claim to the remaining limits of liability applicable to products/completed operations claims under the policies subject to any Pre-1981 PCC Settlement Agreement;

e. PPG's relinquishment of its fifty percent equity interest in the Debtor; and

f. PPG's transfer of its fifty percent equity interest in Pittsburgh Corning Europe, N.V.

*See* Doc. No. 8928, Plan §9.1.3[13] and Exhibit F (PPG Trust Funding Agreement) at 10-11 and

---

[13]Section 9.1.3 of the Plan says:

On the Effective Date with respect to the Debtor, and in accordance with the PPG Trust Funding Agreement with respect to PPG and the PPG Participating Insurers and in accordance with the Corning Trust Funding Agreement with respect to Corning, the Debtor, PPG, the PPG Participating Insurers and Corning will transfer to the Asbestos PI Trust their respective interests (as applicable) in the following: (i) all amounts in the Interim Qualified Settlement Fund as set forth in Section 9.1.1 hereof; (ii) all amounts in the KWELM QSF; (iii) all insurance proceeds received by the Debtor and held in its legal department asbestos account; (iv) the right to receive future insurance proceeds under any Pre-1981 PCC Settlement Agreement (with respect to policies with remaining payment obligations listed on Schedule H to the PPG Trust Funding Agreement) or any PCC Insurance Settlement

(continued...)

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 52 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 52 of 143

Schedule A (first line); Exhibit P-150; Doc. No. 3799, Order Approving KWELMB QSF; Tr.

6/3/2010 at 111:22-112:18 (Fitzpatrick); Doc. No. 633, Order Approving QSF.

161. In addition, as part of the agreement reached with the PPG Participating Insurers

providing for the contributions to the Asbestos PI Trust described below by or on behalf of the

PPG Participating Insurer Entities, PPG has agreed to grant releases to the Travelers

Released/Releasing Entities, the Hartford Released/Releasing Entities, and the

Released/Releasing Excess and Other Primary Insurer Entities, as set forth in the PPG Trust

Funding Agreement.  *See* Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at

Section VI.A and Section VII.A.

      **b.**    **The PPG Participating Insurers' Contributions**

162. For a number of years, PPG and many of the insurers that issued the insurance

policies that were shared by PPG and the Debtor were engaged in a court-approved mediation,

which led to an agreement in principle among PPG, the participating insurers, and the Debtor.

*See* PM Tr. 5/3/2004 at 113:25-114:10 (Ellis); Tr. 5/5/2004 at 58:6-60:1 (Seymour).

163. During the period between the agreement reached for funding of the Second

Amended Plan and the agreement now reflected in the Plan, one formerly participating insurer

has dropped out, and another has joined, with a net decrease of approximately $6,000,000 in

---

[13](...continued)
      Agreement (to the extent such right has not been released by the
      Debtor); (v) the Assigned Claims; (vi) the PPG Trust Contribution;
      and (vii) the Corning Trust Contribution. In addition, 100% of the
      Reorganized PCC Common Stock shall be issued to the Asbestos
      PI Trust.

Note that Schedule H was updated on May 15, 2013, at Doc. No. 9402.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 53 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 53 of 143

funding. Tr. 6/3/2010 at 110:9-18 (Fitzpatrick).

164. The insurer contributions have otherwise remained constant, subject to adjustments in the timing for payments to be made. Tr. 6/3/2010 at 113:22-25 (Fitzpatrick).

165. The Plan identifies as "PPG Participating Insurers" the entities identified as "Participating Insurers" in the PPG Trust Funding Agreement. *See* Doc. No. 8928, Plan §1.1 (Definition of "PPG Participating Insurers").

166. The PPG Trust Funding Agreement defines "Participating Insurers" to mean the "Travelers Companies" (as defined therein), the "Hartford Companies" (as defined therein), the "Participating Other Primary Insurers" (as defined therein as those insurers identified in Column 1 on schedule C to the PPG Trust Funding Agreement), and the "Participating Excess Insurers" (as defined therein as those insurers identified in Column 1 on schedule B to the PPG Trust Funding Agreement) as schedule B was updated in Doc. No. 9402, filed May 15, 2013. Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §§I.NNN, I.AA, I.RR, and I.LL.

167. The insurance policies addressed by the PPG Trust Funding Agreement are identified on Schedules B, C, and D to the PPG Trust Funding Agreement. Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §I.NN (definition of "Participating Insurance Policies").

168. The aggregate payments that the PPG Participating Insurers have agreed to make to the Asbestos PI Trust are set forth in Schedule A of Exhibit F, and total $1,696,498,979 (subject to a pre-payment discount of 5.5 percent per annum). *See* Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §III.B and Schedule A.

169. The contributions by the PPG Participating Insurers (or their assignees) under the

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 54 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 54 of 143

PPG Participating Insurance Policies constitute reasonable settlements and fair resolutions of the alleged liability of the PPG Participating Insurer Entities under such policies for the Channeled Asbestos PI Trust Claims, including Demands. The Plan Proponents and the Plan Supporters agree that such contributions satisfy the liability, if any, of such insurers for Channeled Asbestos PI Trust Claims under the PPG Participating Insurance Policies. This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the PPG Non-Participating Insurers in any insurance coverage litigation between them and PPG. Tr. 5/5/2004 at 56: 10-57:5, 57:23-60:1(Seymour); Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §§I.NN (definition of "Participating Insurance Policies") and III.B; Schedules A, B, C, and D. *See* Plan §8.1.17.

170. Among the conditions to the obligations of the PPG Participating Insurers to make their respective contributions under the PPG Trust Funding Agreement are that the Asbestos Permanent Channeling Injunction expressly provide that the sole and exclusive remedy of holders of Channeled Asbestos PI Trust Claims shall be against the Asbestos PI Trust, and that the Asbestos PI Trust seek and receive releases from holders of Channeled Asbestos PI Trust Claims who receive payment from the Asbestos PI Trust. Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §§II.C and II.J.

171. Under the Plan, "Channeled Asbestos PI Trust Claims" includes Asbestos PI Trust Claims against the "PPG Participating Insurer Entities." Doc. No. 8928, Plan §1.1 (Definitions of "Channeled Asbestos PI Trust Claim" and "Asbestos Protected Party" (part (c)).

172. The PPG Participating Insurer Entities are defined in the Plan to mean "Any of the PPG Participating Insurers (or any past or present corporate parent, subsidiary, predecessor or

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 55 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 55 of 143

Affiliate of any PPG Participating Insurer), solely in their capacity as an insurer of any PPG

Entities, or their respective past or present officers, directors, employees, agents, representatives

and attorneys, or the successors of any of them, in their capacity as such." Doc. No. 8928, Plan

§1.1 (Definition of "PPG Participating Insurer Entities").

173. The PPG Participating Insurers' participation in the funding of the Plan is

conditioned on their receiving the benefits of the Asbestos Permanent Channeling Injunction and

on receiving releases from claimants who receive payment from the Asbestos PI Trust. Tr.

5/15/2004 at 62: 10-18 (Seymour); Tr. 6/3/2010 at114:2-8 (Fitzpatrick); Plan, Exhibit F (PPG

Trust Funding Agreement) §III (first paragraph).

174. The Asbestos Permanent Channeling Injunction, as applied to Channeled Asbestos

PI Trust Claims against the PPG Entities, the PPG Affiliates, the PPG-Affiliated Parties, and the

PPG Participating Insurer Entities, is essential and necessary to the Debtor's reorganization

because neither PPG nor any of the PPG Participating Insurers would be willing to make the

PPG Trust Contribution, without the protection provided by the Asbestos Permanent Channeling

Injunction. Tr. 5/5/2004 at 62:10-18 (Seymour); Tr. 6/3/2010 at 114:2-8 (Fitzpatrick); Doc. No.

8928, Plan, Exhibit F (PPG Trust Funding Agreement) §§II (first paragraph) and II.C; *see* Plan

§8.1.25.

### c. Additional Findings Regarding the PPG Trust Contribution

175. The PPG Trust Contribution is a substantial contribution to the Asbestos PI Trust

and a fundamental component of the Debtor's reorganization. Doc. No. 8928, Plan §9.1.3 and

Exhibit F (PPG Trust Funding Agreement) at 10-11; PM Tr. 5/3/2004 at 112:6-113:21, 120:23-

121:16, 122:8-24, 125:22-127:8, 135:8-13 (Ellis); Tr. 5/5/2004 at 169:21-23, 171:25-172:16

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 56 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 56 of 143

(Fitzpatrick). *See* Plan §8.1.21.

176. With respect to the holders of Channeled Asbestos PI Trust Claims, the PPG Trust

Contribution is a reasonable contribution to the Asbestos PI Trust in consideration of the relief

provided to the PPG Entities, the PPG Affiliates, the PPG-Affiliated Parties, and the PPG

Participating Insurer Entities by the Asbestos Permanent Channeling Injunction, in view of the

alleged and disputed liability of PPG for Channeled Asbestos PI Trust Claims.  This finding,

however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall

not have collateral estoppel effect on the PPG Non-Participating Insurers in any coverage

litigation regarding the insurance coverage rights or obligations of the PPG Non-Participating

Insurers.  Tr. 6/3/2010 at 114:2-115:7 (Fitzpatrick); Tr. 5/5/2004 at 56:4-60:9, 62:10-18

(Seymour); Tr. 5/5/2004 at 112:6-113:1 (Diggs); *see* Plan §8.1.22.[14]

177. The PPG Trust Contribution fully resolves and satisfies the PPG Entities', the PPG

Affiliates', and the PPG-Affiliated Parties' alleged and disputed liabilities for the Channeled

Asbestos PI Trust Claims and is fair and equitable to the holders of such Channeled Asbestos PI

Trust Claims, including, without limitation, the holders of Indirect Asbestos Claims.  This

finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding,

and shall not have collateral estoppel effect on the PPG Non-Participating Insurers in any

insurance coverage litigation regarding the rights or coverage obligations of the PPG-Non-

Participating Insurers. *See* Plan §8.1.15.

### 3.   **The Corning Trust Contribution**

---

[14]References throughout this Memorandum Opinion to PPG Entities, PPG Affiliates,
Corning Entities and Corning Affiliates shall be construed to refer only to revised Exhibits K and
L as reflected in Doc. Nos. 9402 and 9405.

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 57 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 57 of 143

178. Pursuant to the terms and conditions of the Third Amended and Restated Trust

Funding Agreement Among Corning Incorporated, Lawrence Fitzpatrick (Future Claimants'

Representative) and the Trustees of the Asbestos PI Trust, in Connection with the Modified

Third Amended Plan of Reorganization for Pittsburgh Corning Corporation (the "Corning Trust

Funding Agreement"), upon the occurrence of the Funding Effective Date, Corning is to make

contributions to the Asbestos PI Trust on behalf of the Corning Entities, the Corning Affiliates,

the Corning-Affiliated Parties, and/or the Corning Insurers consisting of:

- A series of six installments (each an "Installment") (subject to a discount for pre-payment of 5.5 percent per annum) in cash or, at Corning's election, by transfer or issuance of the cash equivalent in restricted shares of Corning's common stock (the issuance and resale of which are subject to the Corning Registration Rights Agreement as defined in the Corning Trust Funding Agreement), totaling not less than $240 million nor more than $290 million, payable beginning on the one year anniversary of the Funding Effective Date and annually thereafter, through the six year anniversary of the Funding Effective Date;[15]

- Corning's transfer of its fifty percent equity interest in Pittsburgh Corning Europe, N.V.;

- Corning's relinquishment of its fifty percent equity interest in the Debtor;

- Corning's relinquishment of certain insurance rights against the PCC/PPG Policies, the PPG Non-Participating Insurance Policies and the PPG Insolvent Insurance Policies as set forth in the Insurance Claims Agreement.

*See* Doc. No. 8928, Plan §1.1 (definition of "Corning Trust Contribution"), §9.1.3, Exhibit I

(Corning Trust Funding Agreement) §III.A, and Exhibit M (Insurance Claims Agreement) §II.A;

---

[15]The sixth Installment consists of $50 million less any Direct Claim Costs and Future
Direct Claim Costs, as defined in the Corning Trust Funding Agreement.

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 58 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 58 of 143

Tr. 6/3/2010 at 112:19-24 (Fitzpatrick).

179. The Asbestos Permanent Channeling Injunction, as applied to Channeled Asbestos
PI Trust Claims against the Corning Entities, the Corning Affiliates, the Corning-Affiliated
Parties, and the Corning Stipulating Insurers, is essential and necessary to the Debtor's
reorganization because Corning would not be willing to make the Corning Trust Contribution
without the protection provided by the Asbestos Permanent Channeling Injunction. This finding,
however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall
not have collateral estoppel effect in any coverage litigation. Tr. 6/3/2010 at 114:2-11
(Fitzpatrick); Doc. No. 8928, Plan, Exhibit I (Corning Trust Funding Agreement) §§II (first
paragraph), II.C, and II.P). *See* Plan §8.1.35.

180. The Corning Trust Contribution is a substantial contribution to the Asbestos PI Trust
and a fundamental component of the Debtor's reorganization. This finding, however, made for
purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral
estoppel effect on the Corning Insurers in any coverage litigation. Doc. No. 8928, Plan §9.1.3
and Exhibit I (Corning Trust Funding Agreement) at 9-10; PM Tr. 5/3/2004 at 112:6-113:21,
120:23-121:16, 122:8-24, 125:22-127:8, 135:8-13 (Ellis); Tr. 5/5/2004 at 169:21-23, 172:17-25
(Fitzpatrick). *See* Plan §8.1.31.

181. With respect to the holders of Channeled Asbestos PI Trust Claims, the Corning
Trust Contribution is a reasonable contribution to the Asbestos PI Trust in consideration of the
relief provided to the Corning Entities, the Corning Affiliates, the Corning-Affiliated Parties, and
the Corning Stipulating Insurers by the Asbestos Permanent Channeling Injunction, in view of
the alleged and disputed liability of Corning for Channeled Asbestos PI Trust Claims. This
finding, however, made for purposes of Plan confirmation is not binding, shall not be binding,

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 59 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 59 of 143

and shall not have collateral estoppel effect on the Corning Insurers in any coverage litigation regarding the insurance coverage rights or obligations of the Corning Insurers.  PM Tr. 5/3/2004 at 80:21-81:13, 82:17-23 (Ellis); PM Tr. 5/4/2004 at 12:13-19:25, 24:4-26:9, 26:19-27:20, 76:7-14 (Eggers).  *See* Plan §8.1.32.

182. The Corning Trust Contribution fully resolves and satisfies the Corning Entities' , the Corning Affiliates', and the Corning-Affiliated Parties' alleged and disputed liabilities for the Channeled Asbestos PI Trust Claims and is fair and equitable to the holders of such Channeled Asbestos PI Trust Claims, including, without limitation, the holders of Indirect Asbestos Claims. This finding, however, made for purposes of Plan confirmation, is not binding, shall not be binding, and shall not have collateral estoppel effect on the Corning Insurers in any insurance coverage litigation.  *See* Plan §8.1.26.

### D.   Resolution of Competing Claims to Insurance

183. As set forth above, the Debtor, PPG, and Corning have asserted or could assert competing claims to insurance coverage under each others' insurance policies.

184. Specifically, Pittsburgh Corning, PPG, and Corning assert competing claims against certain PCC/PPG Policies and certain Corning Insurance Policies.

185. A condition precedent to the Effective Date of the Plan is the execution of an Insurance Claims Agreement providing for releases by and among the Debtor, PPG, the PCC/PPG Insurers (as defined in the Insurance Claims Agreement),[16] and Corning, relating to

---

[16]The term "PCC/PPG Insurers" as defined in the Insurance Claims Agreement means "the PPG Participating Insurers solely in their capacity as issuers of the PCC/PPG Policies, but not in their capacity as issuers of the Corning Insurance Policies and/or any insurance policies that:  (i) are referenced on Schedule E to the Corning Trust Funding Agreement; and/or (ii) were purchased by Corning or any of the Corning Policyholder Companies or in which Corning or any

(continued...)

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 60 of 100
Case 00-22876-TPA    Doc 9443-2    Filed 05/24/13    Entered 05/24/13 19:18:36    Desc
Corrected Order to fix Typo    Page 60 of 143

respective insurance coverage and competing claims thereto, to be effective upon the Funding Effective Date. Doc. No. 8928, Plan §8.2.7, Exhibit M (Insurance Claims Agreement).

186. Execution of the Insurance Claims Agreement by Corning is also a condition precedent to the obligations of PPG and the PPG Participating Insurers under the PPG Trust Funding Agreement. Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at §II.D.

187. Execution of the Insurance Claims Agreement by PPG, the PCC/PPG Insurers, and the Debtor is a condition precedent to the obligations of Corning under the Corning Trust Funding Agreement. Doc. No. 8928, Plan, Exhibit I (Corning Trust Funding Agreement) at §II.I.

188. The Insurance Claims Agreement provides for releases of certain claims against the PCC/PPG Policies, the PPG Participating Insurance Policies, the PPG Non-Participating Insurance Policies, the PPG Insolvent Policies, and the Corning Insurance Policies, as specified in the Insurance Claims Agreement. Doc. No. 8928, Plan, Exhibit M (Insurance Claims Agreement) §II.A-D.

189. Absent the Plan, the insurance assets potentially available to the Debtor could be depleted by the asbestos claims tendered on behalf of PPG, Corning, and/or Corhart against the same insurance policies. *See* PM Tr. 5/3/2004 at 73:14-23, 75:3-19, 76:8-78:7 (Ellis); Tr. 5/5/2004 at 40:19-54:21, 55:5-58:1 (Seymour); PM Tr. 5/4/2004 at 35:3-36:23, 37:6-38:6, 53:10-13 (Eggers); Exhibits P-20,P-21, P-40, P-57A, P-57B, P-57C, and P-141. As to Corning, as we note in the 2006 Opinion, in some instances, a separate suit may be required but the

---

[16](...continued)
of the Corning Policyholder Companies is the named insured as set forth on the declarations page(s)."

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 61 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 61 of 143

outcome could still adversely affect the Debtor.  417 B.R. at 299-300.

### E.   Processing, Liquidation, and Payment of Present and Future Channeled Asbestos PI Trust Claims

190. The Plan provides that all Channeled Asbestos PI Trust Claims will be resolved pursuant to the terms, provisions, and procedures set forth in the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures ("TDP").  *See* Doc. No. 8928, Plan §3.2.5.

191. The Plan provides that the Asbestos PI Trust will value Channeled Asbestos PI Trust Claims under either an Individual Review process or an Expedited Review process.  *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §5.3(a)(l) and §5.3(b)(l).

192. Under the Expedited Review process, the Asbestos PI Trust will evaluate Channeled Asbestos PI Trust Claims based upon eight separate disease levels, and payments to qualified claims will be made pursuant to a matrix.  *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §5.3(a)(3).

193. The Scheduled Values in the TDP are based on the Debtor's prepetition settlement history.  *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §2.1; Tr. 5/5/2004 at 242:7-12 (Fitzpatrick); Tr. 6/3/2010 at 134:5-12 (Fitzpatrick).

194. The Plan provides that the Channeled Asbestos PI Trust Claims will be paid a percentage of the amount of the claim based upon the Trustees' estimates of total claims and assets available.  *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §§2.3 and 4.2.

195. The Initial Payment Percentage for Channeled Asbestos PI Trust Claims has been set at 37 percent, which was derived from comparing the assets available for Channeled Asbestos PI Trust Claims with the asbestos liabilities of the Asbestos PI Trust for the Channeled Asbestos PI Trust Claims.  *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §2.3.

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 62 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 62 of 143

196. The purpose of a payment percentage is to assure that present claimants will not receive all the trust assets in the early days of the trust and thus preserve trust assets for the future claimants who get sick later. Tr. 5/5/2004 at 164:24-165:5 (Fitzpatrick).

197. The FCR has concluded that the Plan and Plan Documents, including the TDP, which set forth the Initial Payment Percentage of 37 percent for Channeled Asbestos PI Trust Claims, are fair and reasonable to future claimants and provide reasonable assurance that funds will remain available to pay holders of current and future Channeled Asbestos PI Trust Claims in substantially the same manner. *See* Tr. 6/3/2010 at 101:19-102:2 (Fitzpatrick).

198. The Payment Percentage will be reviewed and adjusted periodically to provide reasonable assurance that the Asbestos PI Trust will be in a financial position to pay holders of present and future Channeled Asbestos PI Trust Claims in a substantially similar manner. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §4.2.

199. If the Payment Percentage is raised due to a material change in the estimates of the Asbestos PI Trust's future assets and/or liabilities, the TDP provide for the Asbestos PI Trust to make supplemental payments to all claimants who had previously received payments based on a lower Payment Percentage, subject to an exception suspending any obligation to make a supplemental payment of less than $100. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §4.4.

200. The TDP provide for Alternative Dispute Resolution Procedures ("ADRP") to address, among other things, non-binding arbitration of (i) whether the Asbestos PI Trust's outright rejection or denial of a Channeled Asbestos PI Trust claim was proper and (ii) whether a claimant's medical condition or exposure history met the presumptive requirements of the TDP for categorizing a Channeled Asbestos PI Trust Claim involving Disease Levels I-VIII. The TDP also provide for the option of binding or non-binding arbitration to resolve disputes over

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 63 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 63 of 143

the liquidated value of a Channeled Asbestos PI Trust Claim involving Disease Levels II-VIII and the validity of an Indirect Asbestos Claim. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §5.10(a).

201. If a holder of a Channeled Asbestos PI Trust Claim who has elected non-binding arbitration is still dissatisfied with his or her recovery after arbitrating his/her claim, the claimant is permitted under the Plan to litigate the claim in the tort system. *See* Doc. No. 8928, Plan, Exhibit B (TDP) at §5.11.

202. The medical criteria in the TDP are generally as stringent as what Pittsburgh Corning experienced in the tort system. *See* PM Tr. 5/3/2004 at 125:2-12 (Ellis).

203. The requirement to demonstrate exposure to Unibestos in the TDP is equally as stringent, if not more stringent, than what Pittsburgh Corning experienced in the tort system. *See* PM Tr. 5/3/2004 at 125:15-21 (Ellis).

204. Pursuant to the Asbestos PI Trust Agreement, the Asbestos PI Trust is to have three Trustees, all of whom are to act as fiduciaries to the Asbestos PI Trust, with the powers and responsibilities set forth in the Asbestos PI Trust Agreement. The initial Trustees are Jack Marionneau, Philip A. Pahigian, and A. Andrew MacQueen. *See* Doc. No. 8928, Plan, Exhibit A (Asbestos PI Trust Agreement), §§2.1-2.3 and 4.1, and ¶. 35-36 (signature pages, identifying initial Trustees), Doc. No.6426, Disclosure Statement, Exhibit 4 (list of Trustees); Tr. 5/5/2004 at 248:4-5 (Fitzpatrick).

205. The Asbestos PI Trust Agreement also calls for the formation of a Trust Advisory Committee (the "TAC"), which is to consist of five members. *See* Doc. No. 8928, Plan, Exhibit A (Asbestos PI Trust Agreement) at §5. The initial five members of the TAC are to be Bryan O. Blevins, Jr., Russell W. Budd, Theodore Goldberg, Joseph F. Rice, and Perry Weitz. *See id.* at

63

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 64 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 64 of 143

36-37 (signature pages).  Each of the initial TAC members is a member of a firm that represents

a large number of plaintiffs in asbestos-related personal injury cases.  *See* Tr. 5/5/2004 at

248:17-249:8 (Fitzpatrick).  Members of the TAC are to serve in a fiduciary capacity

representing all holders of present Channeled Asbestos PI Trust Claims.  *See* Doc. No. 8928,

Plan, Exhibit A (Asbestos PI Trust Agreement) at §5.2.  *See* Tr. 5/5/2004 at 249:20-24

(Fitzpatrick).

206. The Trust Agreement provides that the FCR, currently Lawrence Fitzpatrick, is to

serve in a fiduciary capacity, representing the interests of holders of future Channeled Asbestos

PI Trust Claims for the purpose of protecting the rights of such persons.  *See* Doc. No. 8928,

Plan, Exhibit A (Asbestos PI Trust Agreement) at §6.1.

207. Pursuant to the Trust Agreement and the TDP, the Trustees are required to obtain

the consent of the TAC and the FCR before taking a number of actions under or in connection

with the TDP.  Doc. No. 8928, Plan, Exhibit A (Asbestos PI Trust Agreement), §§2.2(f), 5.2 and

6.1;  Exhibit B (TDP) at, *e.g.*, §§2.5 (last sentence), 4.2; 5.3(a)(3), 5.3(b)(l), 5.4(a), 5.8, 5.10(a),

6.1, 6.4, 7.3, 7.5(a), 7.8, and 8.1.

## VII.   OBJECTIONS TO PLAN CONFIRMATION

### A.   Garlock Objections and Rulings Thereon

208. Garlock relies entirely on the objections it filed and that were overruled by this

Court in 2011.  *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 579 (Bankr. W.D. Pa. 2011).  So

as to put into one place the issues regarding the Plan now under consideration, the Court re-states

Garlock's objections and the rulings thereon.  Nonetheless, the rulings from the 2011 Opinion

and Order are incorporated herein by reference.

209. Garlock did not file an objection to the Second Amended Plan as to which

64

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 65 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 65 of 143

confirmation was denied in 2006. In 2009 Garlock filed an objection to confirmation of the Third Amended Plan before it was modified. *See* Objection of Garlock Sealing Technologies, LLC to Confirmation of Third Amended Plan of Reorganization, Doc. No. 7045. In response to the Plan as filed in August 2012, Garlock continues its objections. *See* Garlock Objection and Reservation of Rights, Doc. No. 8983.

210. In its objection at Doc. No. 7045, filed in 2009 ("Garlock Objection"), Garlock asserted that "for several decades" it has been a defendant in asbestos cases, and that prior to Pittsburgh Corning's bankruptcy filing, both Garlock and Pittsburgh Corning were "routinely named" as defendants in "thousands of asbestos cases annually." Garlock Objection at 1.

211. In its 2009 objection Garlock contended that, during Pittsburgh Corning's Chapter 11 Case, "individuals claiming to hold Asbestos PI Trust Claims have continued to assert claims against Garlock alleging that Garlock contributed to their injuries as well." *Id.* at 2.

212. Accordingly, the Garlock Objection asserted that Garlock has claims for contribution against Pittsburgh Corning. *Id.*

213. Despite this contention, at the 2010 confirmation hearing, Garlock's witness, Mr. Turlik, testified that he did not recall any instance in which Garlock had prosecuted an independent action for contribution against Pittsburgh Corning. Doc. No. 7830, Tr. 6/9/2010 at 172:8-13 (Turlik).

214. The bar date for claims to be filed in this case was November 30, 2001. *See* Doc. No. 1097, Order dated September 21, 2001. Notice of the deadline for filing claims was mailed to Garlock. *See* Certificate of Service of Proof of Claim Form and Notice of Bar Date, Doc. No. 1112.

215. Garlock did not file a proof of claim in this case and is not a creditor.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 66 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 66 of 143

216. On June 5, 2010, Garlock filed its own Chapter 11 in the Bankruptcy Court for the Western District of North Carolina, Case No. 10-31607.

217. As has Mt. McKinley, *see infra*, Garlock has objected to the confidentiality provisions of §6.5 of the TDP.  However, the Plan imposes no more of an obligation on Garlock than it faced in the tort system when attempting to access confidential documents and the objection is overruled.  We credit the testimony that in the tort system, defendants generally try to keep the terms of their settlements confidential, and settlement agreements generally contain confidentiality provisions.  Tr. 6/3/2010 at 152:9-18 (Fitzpatrick). The confidentiality provision in §6.5 of the TDP is materially similar to the confidentiality treatment generally available to defendants in the tort system.

Furthermore, the confidentiality provision in the TDP states that the Asbestos PI Trust must respond to a properly issued subpoena. Plan, Exhibit B (TDP) at §6.5.  In addition, there is no prohibition in the TDP preventing a co-defendant such as Garlock from obtaining materials submitted to the Asbestos PI Trust from the claimants themselves.  *Id.*

218. Garlock objects to §5.6 of the TDP which deals with Indirect Asbestos Claims.  The TDP permit those who have paid part or all of the Debtor's asbestos liability to make a contribution claim against the Trust.  This treatment assures that those who pay a claim that otherwise would be paid by the Trust, in the appropriate percentage, do not receive more than the injured asbestos victim would have received.  That Indirect Claimants, which are properly classified in this Plan, cannot sue the Debtor or the Trust or implead either in the tort system is not a function of the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order but of §524(g) and the channeling injunction authorized thereunder.  Enjoining actions against the Debtor for recovery of such claims is part and parcel of a primary

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 67 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 67 of 143

purpose of the §524(g) channeling injunction; that is, to supplement the discharge and permit

financial recovery for the distressed business.

219.   Likewise, Garlock's objection that TDP §7.8 favors holders of Asbestos PI Trust

Claims[17] over Indirect Asbestos Claimants is without merit as that provision makes no distinction

between the types of claims.[18]

220.   Garlock's argument that the Plan improperly classifies or treats Asbestos PI Claims

and Indirect Claimants is overruled.  Indirect Asbestos Claims are properly channeled as they

derive from direct claims (per 11 U.S.C. §524(g)(4)(A)(ii)).  *In re Armstrong World Industries,*

*Inc.*, 348 B.R. 136, 168-69 (D.Del. 2006) ("Because Indirect PI Trust Claims, including those

arising under contract, relate to direct Asbestos Personal Injury Claims they are appropriately

channeled to the Asbestos PI Trust and have historically been channeled to trusts established in

connection with asbestos related chapter 11 cases").

221.   Moreover, all Class 5 claimants, both direct and Indirect, enjoy equal treatment that

satisfies 11 U.S.C. §1123(a)(4).  To be confirmable, a plan must "provide the same treatment for

each claim or interest of a particular class, unless the holder of a particular claim or interest

agrees to a less favorable treatment of such particular claim or interest."  §1123(a)(4).  *In re Dow*

*Corning Corp.,* 255 B.R. 445, 500 (E.D. Mich. 2000) ("As to whether the claim is being treated

fairly within the class, the inquiry is whether the claim is subject to the same process in

---

[17]"Asbestos PI Trust Claims" is the term used in Garlock's objection.

[18]To the extent Garlock objects to §7.7 of the TDP on the basis that Indirect Claims
would not be treated in substantially the same manner as direct claims the objection is overruled.
Section 7.7 provides a process for the circumstance in which a claimant obtains a judgment in
the tort system relating to the Asbestos PI Trust's liability to the claimant and by its terms
applies to all such claims.

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 68 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 68 of 143

satisfying the claim as the other claims within the class"). Under the Plan direct and Indirect

Claims are subject to the same claims process; i.e., the process set up in the TDP and

implemented by the Asbestos PI Trust. The few provisions uniquely applicable to Indirect

Asbestos Claims are narrowly tailored to the nature of those claims. Additionally, because

Garlock failed to file a timely proof of claim, it is not a creditor in this case. We addressed

Garlock's standing in our 2011 Opinion and found that it had none. *See* 453 B.R. at 578-83.

Garlock has presented nothing that would indicate a change in our prior ruling is appropriate.

222. Garlock argues that the lack of a TDP or Plan provision protecting state law setoff

rights of co-defendants leaves co-defendants to suffer the consequences of state law as

interpreted and implied by state courts. This objection is moot as to Garlock, which is now a

Debtor-in-Possession in its own bankruptcy (*In re Garlock Sealing Technologies LLC*, 10-31607

(Bankr. W.D. N.C. 2010)) and no longer a defendant in any state court proceeding. However,

even if it were not moot, any effect arises by virtue of operation of state law and not because of

the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation

Order. Further, any claim of this nature that Garlock may have is subject to provisions of the

Plan and TDP governing Indirect Claims.

223. Garlock objects to §6.3 of the TDP, which permits claimants to withdraw claims

submitted to the Trust, on the grounds that §6.3 allows claimants to "delay" and "defer[ ]" their

claims against the Trust while pursuing Garlock in the tort system, Garlock Objection at 3,

thereby allowing claimants to collect the full amount from co-defendants in the tort system and

collect a second time from the Trust in this case. *See* Doc. No. 7900 at 31. Garlock contends

that this section, along with §6.5 regarding confidentiality, frustrates its contribution rights.

Garlock is no longer a co-defendant in the tort system and this objection is moot. Nonetheless,

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 69 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 69 of 143

the objection is also overruled on the merits.

224. Section 6.3 provides a process for a claimant to withdraw a claim and file another without affecting the status of the claim for statute of limitations purposes but the claim's place in the FIFO Processing Queue will be based on the date of the filing of what is, in effect, an amended claim. A claimant can also request that the Trust defer consideration of the claim for a maximum of three years without affecting the claim's status for statute of limitation purposes. This, in essence, is a tolling provision which will have no impact on Garlock, which is no longer a co-defendant with contribution rights, and which, if it does later, somehow, pay a claim for which it could seek contribution, has the same entitlement against the Trust as have all other Indirect Claimants. The objection is overruled.

225.  Garlock contends that there were intentional misrepresentations on certain ballots and complains that, in the tort system, asbestos victims try to hide exposure to bankrupt entities. Tr. 6/9/2010 at 184:21-185:3 (Statement of Richard Worf, Counsel to Garlock). In support of this contention Garlock referred to ten discovery responses from *other* litigation, which, Garlock asserted, have information that is not consistent with the ballots regarding exposure to Pittsburgh Corning products. Doc. No. 7900 at 31, citing Garlock Exhibits 121, 132, 147, 165, 174, 178, 203, 245, 327, and 356. Garlock made no attempt to authenticate those and a similar document, Garlock Exhibit 167, and no witness was offered to acknowledge or explain the documents, nor was any explanation given as to the unavailability of a witness. *See* Tr. 6/9/2010 at 182:13; 185:6-7. The documents were not offered as a random or representative sample. *Id.* at 191:14-17, 193:2-9 (Statement of Richard Worf, Counsel to Garlock). Further, seven of the eleven responses were not signed by the plaintiff or plaintiff's personal representative as required by the

69

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 70 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 70 of 143

jurisdiction in which they were provided.[19]  *See* Garlock Exhibits 121, 132, 165, 174, 178, 203, and 245.[20]  Thus, they are not admissible evidence.  Fed. R. Evid. 801(c), 804, 903.

226.  Nonetheless, even if the Court were to consider such evidence as admissible, seven of the eleven discovery responses identify claimants' exposure to asbestos products for which bankrupt entities other than Pittsburgh Corning allegedly had responsibility.  *See* Garlock Exhibits 121, 132 165, 167, 178, 174, and 203.  For example, the discovery response marked as Exhibit 203 identifies ten bankrupt entities, including Armstrong, Babcock & Wilcox, Fibreboard, Owens Corning, USG, and others.  *See* Garlock Exhibit 203 at 7-30.  To the extent that Garlock offered these documents to prove a "propensity" to conceal exposure to bankrupt entities, the documents themselves undercut that conclusion as multiple such defendants are listed.

Although it was not Mt. McKinley who offered the exhibits, in its motion for reconsideration Mt. McKinley argued that the Garlock exhibits had been admitted at the June 9

---

[19]The Court conditionally admitted only those responses that were "<u>signed and filed</u> after the ballot ... submit[ted] in this case that says they [*sic*] have a claim against the debtor and the [response to] the request for admission is to the contrary."  Tr. 6/9/2010 at 198:25-199:7. (Emphasis added.)

[20]Even if, *arguendo*, the eleven discovery responses Garlock cites demonstrated that intentional misrepresentations were made to Garlock in the tort system or that the claimants were ineligible to cast a ballot in this case, there would be no effect on the voting as a total of 359,298 Class 5 votes were cast.  Doc. No. 7478, Logan Declaration at ¶21  No claims have been presented to the Trust because the Plan has not yet been confirmed and the TDP and Trust are not established.  There has been no showing that claimants would seek full payment for their entire injury from Garlock and then again from this Trust or vice versa.  Furthermore, in order to collect from the Asbestos PI Trust, evidence of "meaningful and credible exposure to the Debtor's asbestos or asbestos-containing product(s)" must be presented.  TDP §5.7(b)(3).  We note that many asbestos claimants allege and establish exposure to the products or conduct of more than one defendant.  The TDP properly define the parameters of the claims that the Trust may pay and the necessary evidence to support those claims.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 71 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo     Page 71 of 143

and 10, 2010, confirmation hearing and because no one had sought reconsideration of that

admission the Court could not now retract the admission.  Mt. McKinley misunderstands the

Court's ruling on June 9 wherein the conditional admission of the exhibits, including the weight

to be attributed and their relevance and materiality, was subject to post-trial consideration by the

Court.  *See* Tr. 6/9/2010 at 176:18-199:21.  Mt. McKinley's reconsideration request on this point

is denied.

227. With respect to Garlock's objections addressed to the Trust Advisory Committee

("TAC"), essentially, that the composition of the TAC is somehow improper, the provisions of

the Asbestos PI Trust Agreement and the TDP define the powers of the TAC and Trustees, all of

whom are fiduciaries.  There is nothing in the record suggesting that any of the TAC (or

Trustees) will breach their fiduciary duties.

228. Further, there is no provision in the Asbestos PI Trust Agreement or the TDP for

involvement by the TAC in the processing of individual claims.  Under the TDP, the TAC has a

right of consultation under the Asbestos PI Trust Agreement only with respect to general

implementation and administration of the Trust and the TDP.

The Asbestos PI Trust Agreement, §2.2(e), provides that "[t]he Trustees shall consult

with the TAC and the Future Claimants' Representative (i) on the general implementation and

administration of the Asbestos PI Trust; (ii) on the general implementation and administration of

the TDP; and (iii) on such other matters as may be required under this Asbestos PI Trust

Agreement and the TDP."

Subsection (f) of §2.2 provides that "The Trustees shall be required to obtain the consent

of the TAC and the Future Claimants' Representative pursuant to the Consent Process set forth

in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 72 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 72 of 143

order to" perform various functions including, but not limited to, changing the Claims Payment

Ratio, Disease Levels or Medical/Exposure Criteria, Scheduled, Average and/or Maximum

Values, and proof of claim forms and materials. *See also* Asbestos PI Trust Agreement, §§5.7

and 6.6 (consultation and consent processes with respect to the TAC and FCR, respectively).[21]

Thus, the TDP is properly crafted in this regard and Garlock's objection is overruled.

229. Garlock has reserved its right to appeal from any rulings regarding its standing and

its substantive objections inasmuch as the denial of confirmation in 2011 precluded such an

appeal. Doc. No. 8983. In our 2011 Opinion we ruled that Garlock's objections were without

merit and that it is not a creditor of this Debtor. *In re Pittsburgh Corning Corp.*, 453 B.R. 570,

579 (Bankr. W.D. Pa. 2011). We further held that "[t]o the extent Garlock could be considered a

future demand holder based on a hypothetical possibility of a future contribution claim, such

claims are provided for in the Modified Third Amended Plan and the TDP and Garlock's

treatment thereunder, as is the treatment of all Indirect Asbestos Claimants, is fair and

equitable." *Id.* at 580 and n.15.

Except for the fact that Garlock is now involved in its own Chapter 11 in the Bankruptcy

Court for the Western District of North Carolina (Charlotte), Bankr. No. 10-31607, nothing has

changed with respect to Garlock and nothing has been presented to this Court to indicate that a

change in our 2011 ruling as to Garlock is appropriate. Therefore, we incorporate our prior

rulings as to Garlock's objections and find that, although we have addressed those objections

based on the complete record, Garlock has no standing and we overrule Garlock's objection to

the latest Plan.

---

[21]The Asbestos PI Trust Agreement also contains a dispute resolution provision in §7.11
which includes submission to an ADR process and ultimately to a court.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 73 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 73 of 143

### B.       The Sledz Claimants Objections and Rulings Thereon

230. Certain Pittsburgh Corning Cancer Claimants ("CPCCC") had filed objections to the

Plan.  Doc. No. 6624 (Preliminary Objections) and Doc. No. 7067 (Final Objections).

231. Plan Proponents and the CPCCC resolved these objections by modifying the Plan

definition of "Asbestos Protected Party." *See* §1.1 of Plan, subparts (b)(1) and (e)(1) of

definition of "Asbestos Protected Party." *See also* Stipulation Between the Certain Pittsburgh

Corning Cancer Claimants, the Debtor, the Future Claimants Representative, and the Official

Committee of Asbestos Creditors Resolving Certain Pittsburgh Corning Cancer Claimants' Plan

Objection, Doc. No. 7400 ("Stipulation").

232. The Stipulation provided that the CPCCC's withdrawal of its objection did not

"withdraw the objections raised by the Sledz Claimants as previous members of the CPCCC"

and that nothing in the Stipulation would prejudice any rights the Sledz Claimants had to pursue

those objections in their individual capacities.  Doc. No. 7400 at 3, n.2.

233. The Sledz Claimants did not file a pretrial statement and did not appear at the

confirmation hearing.  Thus, no individual objection was raised.  To the extent one is deemed

raised, the objection has been abandoned or waived and, in any event, is overruled.

### C.       Mt. McKinley Objections and Rulings Thereon

#### 1.       Background

234. Mt. McKinley issued certain Pre-7/1/81 PPG Policies and Post-7/1/81 PPG Policies.

Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at Schedule E; Exhibit P-57;

Exhibit P-57B.

235. In May 1997, Mt. McKinley entered into a settlement agreement with respect to

Pittsburgh Corning's asbestos-related liability claims under the Pre-7/1/81 PPG Policies issued

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 74 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 74 of 143

by Mt. McKinley.  3/10/2004 DEP. Tr. at 28:19-29:15 (Kenney); AM Tr. 5/4/2004 at

42:21-42:24 (Ellis).  Pursuant to that agreement, the aggregate limits of liability applicable to

products/ completed operations claims under the Pre-7/1/81 PPG Policies issued by Mt.

McKinley have been exhausted.  *See* AM Tr. 5/4/2004 at 42:21-43:10 (Ellis); Tr. 5/5/2004 at

81:20-82:17 (Seymour); 3/10/2004 DEP. Tr. at 36:7-19, 50:25-51:1 (Kenney).

236.  Mt. McKinley elected not to become a PPG Participating Insurer with respect to its

Post-7/1/81 PPG Policies.  Doc. No. 8928, Plan, Exhibit F (PPG Trust Funding Agreement) at

Schedule E.

237. Mt. McKinley issued certain insurance policies to Corning.  Doc. No. 8928, Plan,

Exhibit I (Corning Trust Funding Agreement) at Schedule B-3.

238. Mt. McKinley has not filed a proof of claim in this case.

239. Mt. McKinley admits that it does not have a present claim for reimbursement,

contribution, or indemnity with respect to the PPG Trust Contribution or the Corning Trust

Contribution.  5/26/2010 DEP. Tr. at 47:16-48:11 (Kenney).

240. Following the proposal of amendments to Plan §11.9 (Judgment Reduction) (and

related changes to definitions), Mt. McKinley has withdrawn its objection to the treatment of its

potential claims to contribution, indemnity, reimbursement, subrogation, or similar claims over

in connection with Corning Trust Contribution Recovery Claims or PPG Coverage Claims.  Doc.

No. 8733, Tr. 3/16/2012 at 8:16-10:6.

241. For purposes of addressing Mt. McKinley's numerous objections, we will

sometimes set out the objections and later the accompanying analysis and sometimes will include

analysis with the objections.

242.  So as to eliminate any doubt, in the event that a particular Finding or Conclusion

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 75 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 75 of 143

does not specify the following caveat, it is set out in full here and applies to all of Mt. McKinley's objections and the rulings thereon:  Nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order are issued for any purpose other than to determine whether the Plan is confirmable and to issue the Confirmation Order and the Asbestos Permanent Channeling Injunction.  That is, nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order adjudicates, shall be offered into evidence for the purpose of adjudicating or shall be interpreted as adjudicating any fact or legal issue in any coverage litigation or proceeding between Mt. McKinley and PPG, between Mt. McKinley and Corning or between Mt. McKinley and the PPG Participating Insurers.  This Court has no opinion and expresses no opinion as to (1) any right, obligation, defense, claim or any other provision or entitlement of any unsettled PPG or Corning insurance policy issued by Mt. McKinley; (2) the effect, if any, of applicable nonbankruptcy law regarding any policy requirement or provision (or the rights, obligations, defenses or claims which may inure thereto or therefrom) in coverage litigation or proceedings by and between Mt. McKinley and PPG, between Mt. McKinley and Corning or between Mt. McKinley and the PPG Participating Insurers; (3) the effect, if any, of applicable nonbankruptcy law on Mt. McKinley based upon Insurance Settlement Agreements as to which Mt. McKinley was not a party other than to note that the Insurance Settlement Agreements to which Mt. McKinley was not a party are not contractually binding upon Mt. McKinley.

243.  For the reasons which follow, all of Mt. McKinley's objections are overruled.

## 2.  The Plan Does Not Alter Mt. McKinley's Coverage Rights, Obligations or Defenses.

244. Mt. McKinley objects that "The Plan not only impairs Mt. McKinley's right to

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 76 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 76 of 143

obtain [information about claims submitted for payment] from Plan Supporters [PPG and

Corning, *see* Doc. No. 8984 at 1, n.2] but it seeks to excuse Plan Supporters from their

obligations by erecting barriers that would make it exceedingly difficult, if not impossible, to [ ]

obtain that data post-confirmation." Doc. No. 8984 at 3.

245. Mt. McKinley also objects on the grounds that, by not providing Plan Supporters

with access to claims information submitted to the Asbestos PI Trust, the Plan "will allow [PPG

or Corning] to argue in coverage litigation, and in response to Mt. McKinley's demands for

claim-specific information supporting any alleged coverage obligation, that they are unable to

comply with their policy obligations because of the terms of the Court-approved Plan, thus

seeking to self-interestedly excuse the breach of their duty to cooperate with and assist Mt.

McKinley under their policies." Doc. No. 8984 at 8.  We disagree as to both objections.

246. No provision of the Plan purports to alter Mt. McKinley's rights (if any) under its

PPG or Corning policies, its coverage obligations (if any) or its defenses (if any) to coverage.

247. Nothing in the Plan, the Plan Documents, these Findings of Fact or Conclusions of

Law, or the Confirmation Order alters, preempts, modifies, or supersedes any rights or

obligations that PPG or Corning may have as to Mt. McKinley or that Mt. McKinley has as to

PPG or Corning under the PPG Non-Participating Insurance Policies issued by Mt. McKinley or

the Corning Insurance Policies issued by Mt. McKinley, or alters the provisions of

nonbankruptcy law applicable to such rights or obligations.  This Court makes no findings or

conclusions regarding the provisions or effect of any insurance policy or of any entity's rights or

obligations with respect thereto, or regarding the consequences to a third party of any insurance

settlement agreement, any settlement agreements by, between and/or among Debtor, PPG,

Corning and other insurers as to which Mt. McKinley was not a party are not contractually

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 77 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 77 of 143

binding upon Mt. McKinley and the effect, if any, on Mt. McKinley shall be determined by a

court of competent jurisdiction, under applicable non-bankruptcy law, if and when the issue

arises. The same is true whether the settlement agreements were reached during the course of

the bankruptcy or prior thereto; neither the bankruptcy nor the Plan creates this result.

248. Moreover, the Court makes no findings or conclusions regarding PPG's or

Corning's obligations to Mt. McKinley, if any, with respect to claim handling or claim

information and nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of

Law or the Confirmation Order shall be offered as evidence or construed otherwise. To the

extent, however, that any provision of the Plan renders it more difficult or impossible for PPG or

Corning to comply with any obligation that it may have to Mt. McKinley (if such obligation

exists) nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or

the Confirmation Order excuses PPG or Corning from performing any such obligation or relieves

PPG or Corning from whatever consequences, if any, may result under applicable nonbankruptcy

law from any failure or inability to perform such an obligation.

249. Mt. McKinley next objects that "The Plan has been structured to allow payment of

... non-compensable and fraudulent claims, and this harms Mt. McKinley because Plan

Supporters will rely on this Court's confirmation order to establish that such liabilities are valid

when seeking coverage." Doc. No. 8984 at 53. We disagree.

250. The Plan is not so structured. To the contrary, the Trust and TDP are designed to

pay only valid claims. What, if any, bearing the number of claims handled or paid by the Trust,

the aggregate amounts paid by the Trust, or the amounts paid to individual claimants has

regarding any coverage disputes between Mt. McKinley and PPG or between Mt. McKinley and

Corning is a matter for the coverage courts to determine, applying applicable nonbankruptcy

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 78 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 78 of 143

law.  Nothing in the Plan, the Plan Documents, these Findings of Fact and Conclusions of Law

or the Confirmation Order determines or purports to determine any fact or rule on any legal issue

in a coverage dispute between those parties.

251.  Mt. McKinley also objects that "[t]he Plan harms Mt. McKinley by including

hundreds of non-debtors within the scope of the channeling injunction," Doc. No. 8984 at 56,

and that "[t]his structure harms Mt. McKinley because it imposes on Mt. McKinley massive

administrative burdens and associated costs to do something that the Plan Supporters were

obligated to do in the first instance – establish that a particular claim was covered under the

terms and conditions of the policies." *Id.* at 57.  We disagree.

252.  First, no claims are channeled that do not meet the derivative liability test

established in the Plan and Plan Documents, and these are in accord with the requirements of

§524(g).  Second, the Court makes no finding or conclusion as to whether any claim that the

Trust may pay is covered under any Mt. McKinley policy and nothing in the Court's findings or

conclusions alters any burden of proof in coverage litigation involving Mt. McKinley.  Third,

§524(g)(4)(A),(B) specifically authorizes the extension of the channeling injunction to entities

like those included in the Asbestos Permanent Channeling Injunction in this case, *see*  Doc. No.

9402, Exhibits K and L, when the other requirements of §524(g) are met. *Cf. Matter of Emerson*

*Radio Corporation.*, 173 B.R. 490, 493 (D.N.J. 1994) (describing and applying "affiliate"as

defined in §101(2)(B) in context of Fed. R. Bankr. P. 1014).  This Plan satisfies the requirement

of §524(g) and the inclusion of the third parties in Exhibits K and L is appropriate.

253.  The Court makes no finding or conclusion regarding whether any of the policies

issued by Mt. McKinley imposes upon PPG or Corning any obligation to establish how much of

either of their respective trust contributions is being made on behalf of each PPG Entity, PPG

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 79 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 79 of 143

Affiliate, PPG-Affiliated Party, Corning Affiliated Parties, Corning Affiliates or Corning

Entities, as the case may be. To the extent, however, that such an asserted obligation exists for

purposes of coverage disputes, nothing in the Plan, Plan Documents, these Findings of Fact and

Conclusions of Law or the Confirmation Order does or shall alter, preempt, modify, or supersede

any such obligation, if it exists.

Further, nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of

Law or the Confirmation Order excuses performance by PPG or Corning of any obligations it

may have under its policies with Mt. McKinley and nothing relieves PPG or Corning from

whatever consequences, if any, may result under applicable nonbankruptcy law from any failure

or inability to perform any such obligation, if it exists.

For Plan confirmation purposes, however, the Court notes that there is nothing in §524(g)

that requires a designation of any portion of PPG's or Corning's contribution to any related

entity in order to benefit from the Asbestos Permanent Channeling Injunction. PPG's, PPG

Participating Insurers' and Corning's contributions to the Asbestos PI Trust, which together with

the Debtor's total over $3 billion, are sufficient to sustain the imposition of the injunction in

favor of the listed and identified entities and affiliates.

254. Mt. McKinley objects that "The Plan impermissibly alters Mt. McKinley's policy

right to have its insured substantiate that claims submitted for payment are within the scope of

coverage and imposes additional burdens on Mt. McKinley." Doc. No. 8984 at 11. Mt.

McKinley also asserts that there exists a "fundamental insurance coverage principle that the

policyholder must prove that each of the claims for which it seeks coverage are [*sic*] in fact

covered under the policies." *Id.* at 12.

255. The Court makes no finding or conclusion regarding whether any of the policies

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 80 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 80 of 143

issued by Mt. McKinley imposes upon PPG or Corning any obligation to substantiate that claims submitted for payment are within the scope of coverage or whether PPG or Corning must prove that each claim for which it seeks coverage is covered under the policies.  To the extent, however, that such asserted obligations exist, nothing in the Plan alters, preempts, modifies, or supersedes such obligations, or itself excuses performance by PPG or Corning of any such obligations that either of them may have, and nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order relieves PPG or Corning from whatever consequences, if any, may result under applicable nonbankruptcy law from any failure or inability to perform such an obligation, if one exists.

256. Mt. McKinley objects that PPG or Corning will rely on this Court's approval of its aggregate contributions to the Plan as evidence of a "reasonable global settlement" of its "liability related to Channeled Asbestos PI Trust Claims, regardless of the merits of the individual claims." Doc. No. 8984 at 12.  The objection is overruled as stated below.

257. Nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order refers to a "global settlement" nor does anything therein, nor shall anything therein, constitute or be construed or interpreted as constituting, a finding or conclusion that is binding for insurance coverage purposes regarding PPG or Corning's liability for individual claims.  However, PPG and Corning are capping their contributions to Channeled Asbestos PI Trust Claimants and Demand Holders, as authorized by §524(g).

258. In order for the Court to confirm a plan, the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent, by the debtor . . . or in connection with . . . the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. §1129(a)(4).

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 81 of 100
Case 00-22876-TPA    Doc 9443-2    Filed 05/24/13    Entered 05/24/13 19:18:36    Desc
Corrected Order to fix Typo     Page 81 of 143

259. Furthermore, 11 U.S.C. §524(g) provides that "benefits" must be provided to the Trust on behalf of the debtor or third party in order to have a channeling injunction issue. 11 U.S.C. §524(g)(4)(B)(ii). This Plan provides for those "benefits".

260. Therefore, the findings in Plan §§8.1.17 (PPG Participating Insurers' contributions), 8.1.22 (the PPG Trust Contribution), and 8.1.32 (Corning Trust Contribution) are necessary to confirmation and, here, are proper and supported by the credible evidence, which, *inter alia,* established the nature and amount of contribution. Such findings have no effect on rights, obligations, claims or defenses in coverage litigation involving Mt. McKinley.

261. Despite Mt. McKinley's assertions to the contrary, the Plan is "insurance neutral" in that revised §11.17.1, filed at Doc. No. 9402 on May 15, 2013, provides:

> Notwithstanding anything to the contrary in the Confirmation Order or the Plan, nothing in the Confirmation Order or the Plan (including any other provision that purports to be preemptory [*sic*] or supervening) shall in any way operate to impair, or have the effect of impairing the insurers' legal, equitable or contractual rights, if any, in any respect; the rights of the insurers shall be determined under: the PPG Non-Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies, the PPG Participating Insurance Policies, the PCC Settled Insurance Policies and related Insurance Settlement Agreements, as applicable. The enjoining of insurers' contribution and subrogation claims under the Asbestos Permanent Channeling Injunction shall not be deemed to be impairment  of the insurers' rights.

262. Further, Section 11.17.2 provides:

> The PPG Non-Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies, the PPG Participating Insurance Policies, the PCC Settled Insurance Policies and related Insurance Settlement Agreements are binding upon the parties thereto and as to non-parties have the effect as provided by applicable non-bankruptcy law.

263. Therefore, pursuant to §11.17.3:

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 82 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 82 of 143

> (A) The PPG Coverage Claim Parties are hereby permanently
> enjoined from offering into evidence in support or defense of a
> PPG Coverage Claim or PPG Coverage Claim Reduction, and (B)
> the Corning Trust Contribution Recovery Claim Parties are hereby
> permanently enjoined from offering into evidence in support or
> defense of a Corning Trust Contribution Recovery Claim or
> Corning Trust Contribution Recovery Claim Reduction, any of the
> following as binding in any way (including as a basis for res
> judicata, collateral estoppel, issue preclusion or claim preclusion),
> as constituting an adjudication for coverage purposes, or as
> otherwise being probative of the truth of any matter asserted
> therein: (i) any finding or conclusion by the Bankruptcy Court or
> the District Court adopting any of the findings or conclusions set
> forth in Section 8.1 of the Plan, or (ii) the second sentence of
> Section 1.1 of the TDP.

264. Mt. McKinley contends that §11.17.1 and §11.17.3 of the Plan do not prohibit the

Plan Supporters from using the Plan or Plan Documents in coverage litigation. Doc. No. 8984 at

28, 30, 31, and 33. This Court makes no findings or conclusions regarding the effect of

nonbankruptcy law on the use of the Plan, Plan Documents, these Findings of Fact and

Conclusions of Law or the Confirmation Order in coverage litigation. However, as noted

throughout, PPG and Corning have agreed that they will not offer into evidence or otherwise use

this Court's findings and conclusions regarding §8.1 of the Plan or the second sentence of §1.1

of the TDP, nor argue that the findings have collateral estoppel effect in coverage litigation

involving Mt. McKinley. Likewise, this Court has narrowly tailored the findings and

conclusions to apply only to confirmation of this Plan and not to coverage issues inasmuch as

coverage issues are not before the Court and are not addressed herein.

265. Mt. McKinley also contends that the last sentence of §11.17.1[22] is a *"proviso"* that

impermissibly detracts from the concept of insurance neutrality. This contention, too, is without

---

[22] "The enjoining of insurers' contribution and subrogation claims under the Asbestos
Permanent Channeling Injunction shall not be deemed to be impairment of the insurers' rights"

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 83 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 83 of 143

merit inasmuch as the last sentence merely clarifies, at the request of many insurers, that "insurance neutrality" does not prohibit the imposition of the Asbestos Permanent Channeling Injunction in this case. The effect of the Judgment Reduction provision of §11.9 of the Plan to which Mt. McKinley agreed and the inclusion of Mt. McKinley as an Asbestos Protected Party to which it also agreed provide it with adequate protection of any contribution or subrogation claims. The contested sentence, therefore, iterates the remedial effect of the channeling injunction, adds nothing substantive, and excludes nothing from the province of any coverage court.

266. Mt. McKinley objects that the inclusion of certain language[23] in the insurance neutrality clause is a deficiency that affects Mt. McKinley because "Insurance Settlement Agreements" is "an open-ended list of past, present, and future agreements . . . whose contents are unknown and unknowable." Doc. No. 9386 at 5. This objection is likewise without merit. The Insurance Settlement Agreements clearly will govern the relationship of the parties to the agreements and inclusion of that fact in §11.17.1 is appropriate. That applicable nonbankruptcy law may have an effect on Mt. McKinley because of those settlement agreements is not a function of the Plan, Plan Documents, these Findings of Fact or Conclusions of Law or the Confirmation Order and therefore does not affect the confirmability of this Plan.

267. The Court further finds and rules that language in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law, the Confirmation Order or Insurance Settlement Agreements referring to or suggesting that coverage is exhausted under certain policies is (1) an

---

[23] "[T]he rights of the insurers shall be determined under: the PPG Non-Participating Insurance Policies, the Corning Insurance Policies, the Other Corning Policies, the PPG Participating Insurance Policies, the PCC Settled Insurance Policies and related Insurance Settlement Agreements, as applicable."

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 84 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 84 of 143

agreement between the insured and insurer who settled, (2) is a finding for Plan confirmation

purposes only, (3) insofar as Insurance Settlement Agreements are concerned, is binding on only

the parties thereto and (4) as to non-parties to the Insurance Settlement Agreements, the

Agreements will have the effect, if any, provided by applicable nonbankruptcy law.

### 3. Those Findings From §8.1 of the Plan as Set Forth Herein Do Not Harm Mt. McKinley and Do Not Alter Mt. McKinley's Coverage Rights, Obligations or Defenses

268. Mt. McKinley objects that the findings in Article VIII of the Plan are unnecessary,

are not required by the Bankruptcy Code and are included only to give Plan Proponents and Plan

Supporters an advantage in coverage litigation. We disagree. Nothing in those findings adopted

by this Court[24] as set forth in §8.1 of the Plan, or the Plan Documents, these Findings of Fact and

Conclusions of Law or the Confirmation Order purports to adjudicate the liability of PPG or

Corning to holders of asbestos Claims and Demands. Rather, PPG and Corning are settling their

disputed liability with the Debtor and those holding Channeled Asbestos PI Trust Claims and

Demands through their Trust Contributions. The findings in §8.1 of the Plan referring to "fair

and equitable" in connection with the Trust Contributions and, as stated *supra* are required by

§524(g)(4)(B)(ii). *See* Plan §§8.1.15 and 8.1.26. References in the Plan sections to the

resolution and satisfaction of disputed liability to the holders of Channeled Asbestos PI Trust

Claims are for Plan purposes only and have no bearing on PPG's or Corning's or Mt.

McKinley's rights, obligations, claims or defenses under Mt. McKinley's policies for purposes

of coverage litigation.

---

[24]The Court has not incorporated all of the "Conditions Precedent to Plan Confirmation" as listed in §8.1 of the Plan. Others have been modified.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 85 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 85 of 143

269. The findings in Plan §§8.1.22 and 8.1.32 that the PPG and Corning Trust Contributions are reasonable, are required by 11 U.S.C. §§1129(a)(4) and, to the extent that they are also fair and equitable, by §524(g)(4)(B)(ii).  In this case those findings are supported by the credible evidence.  Moreover, as provided in the applicable sections of  Plan Article VIII, the findings "shall not be binding and shall not have collateral estoppel effect on" the PPG Non-Participating Insurers or the Corning Insurers "in any coverage litigation regarding the insurance coverage obligations of" such Insurers.  We find, however, that they also have no collateral estoppel effect on the rights or defenses of those parties in such litigation.

270. The finding in §8.1.17 that the contributions by the PPG Participating Insurers or their assignees under the PPG Participating Insurance Policies are reasonable settlements and fair resolutions of those Insurers' alleged liability under the Policies for Channeled Asbestos PI Trust Claims and Demands and that the settlements satisfy those Insurers' liability for channeled Claims and Demands is based on the credible evidence and is required by 11 U.S.C. §§1129(a)(4) and §524(g)(4)(B)(ii) in order for the PPG Participating Insurers to obtain the benefit of the Channeling Injunction.  Further, this section of the Plan provides that it "shall not be binding and shall not have collateral estoppel effect on the PPG Non-Participating Insurers in any insurance coverage litigation between them and PPG."  Again, we find that the rights and defenses as well as the obligations of those parties will be adjudicated without a collateral estoppel effect in coverage litigation.  That is, nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order constitutes or shall be construed or interpreted as constituting, a finding or conclusion that is binding for insurance coverage purposes.

271. Mt. McKinley objects to the requested finding in §8.1.45 of the Plan as impairing

85

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 86 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 86 of 143

its rights. We disagree. This section provides that the Asbestos Permanent Channeling Injunction, as applied to Channeled Asbestos PI Trust Claims against the PCC (*i.e.* Debtor's) Settled Insurer Entities, is "essential and necessary" to the Debtor's reorganization because the PCC Settled Insurers would not otherwise be willing to make the payments specified in the PCC Insurance Settlement Agreements without the protection of the Asbestos Permanent Channeling Injunction and we so find. The insurance proceeds funding the Plan through the Insurance Settlement Agreements contribute to the feasibility of this Plan. Further, the Plan provides in §8.1.45 that the finding "shall not be binding and shall not have collateral estoppel effect on the Corning Insurers in any coverage litigation regarding the insurance coverage obligations of the Corning Insurers." That is, nothing in the Plan, Plan Documents, these Findings of Fact and Conclusions of Law or the Confirmation Order constitutes or shall be construed or interpreted as constituting, a finding or conclusion that is binding for insurance coverage purposes.

272. Mt. McKinley objects to §1.1 of the TDP in that it states that the TDP is "designed to provide fair, equitable, and substantially similar treatment for all Channeled Asbestos Trust Claims that may presently exist or may arise in the future in substantially the same manner," contending that such a finding is unnecessary. However, §524(g) requires that all Asbestos PI Trust Claims and Demands be dealt with "equitably," §524(g)(2)(B)(ii)(III) and (V) (the Trust "will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner"). *See also id.* at §524(g)(4)(B)(ii) (channeling injunction valid and enforceable if it is "fair and equitable with respect to the persons that might subsequently assert such demands"). The credible evidence supports this finding and §1.1 of the TDP has no bearing on insurance coverage issues.

273. Thus, for the avoidance of doubt as to the purpose and applicability of the findings

Case 2:13-cv-01639-JFC  Document 1  Filed 11/18/13  Page 87 of 100
Case 00-22876-TPA  Doc 9443-2  Filed 05/24/13  Entered 05/24/13 19:18:36  Desc
Corrected Order to fix Typo  Page 87 of 143

herein, the Court rules that findings requested in the Plan as a condition to confirmation regarding the reasonableness of the contributions made to the Asbestos PI Trust "shall not be binding and shall not have collateral estoppel effect on the PPG Non-Participating Insurers or the Corning Insurers."

274. Moreover, as set forth in §11.17.3 of the Plan, (1) the PPG Coverage Claim Parties are enjoined from offering into evidence in support or defense of a PPG Coverage Claim or PPG Coverage Claim Reduction, and (2) the Corning Trust Contribution Recovery Claim Parties are enjoined from offering into evidence in support or defense of a Corning Trust Contribution Recovery Claim or Corning Trust Contribution Recovery Claim Reduction, any of the following against Mt. McKinley as binding in any way (including as a basis for res judicata, collateral estoppel, issue preclusion or claim preclusion), as constituting an adjudication for coverage purposes, or as otherwise being probative of the truth of any matter asserted therein:

> any finding or conclusion by the Bankruptcy Court or the District Court adopting any of the findings or conclusions set forth in Section 8.1 of the Plan, or the second sentence of Section 1.1 of the TDP.

275. Accordingly, the Court finds that nothing in the §8.1 findings issued by the Court[25] herein (or the second sentence of §1.1 of the TDP) harms Mt. McKinley.[26]

### 4. The Criteria Set Forth in the Pittsburgh Corning Corporation Asbestos PI Trust Distribution Procedures Have No Impact on Mt. McKinley's Coverage Obligations or Defenses

---

[25]*See* note 24, *supra.*

[26]Mt. McKinley complains that §11.17.3 is limited to findings in §8.1 of the Plan and the second sentence of TDP §1.1. Doc. No. 8984 at 31. It is those sections, however, that form the basis of Mt. McKinley's objections regarding what will or will not happen in coverage litigation or proceedings.

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 88 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 88 of 143

276. Under the Plan, neither the Plan Supporters nor the Debtor will assign or transfer their rights to insurance coverage, including any rights they may have to coverage from Mt. McKinley, to the Asbestos PI Trust.

277. Because no rights to Mt. McKinley's unsettled insurance policies are being assigned to the Asbestos PI Trust, the Asbestos PI Trust will not be able to seek reimbursement from Mt. McKinley, or sue Mt. McKinley for insurance coverage or indemnity, for any claim paid by the Asbestos PI Trust pursuant to the TDP.

278. Mt. McKinley contends that PPG and Corning "will seek to use [the TDP] as an expeditious means to recover their Trust contributions against Mt. McKinley under one of two theories." Mt. McKinley Brief in Response to Court's Directive at 4/16/2012 Omnibus Hearing to Identify Harm Caused by Plan, Doc. No. 8804 at 33.

279. Mt. McKinley's first theory is that, to the extent that PPG or Corning seeks to recover its Trust Contributions on a "lump sum" basis, it will use the TDP to substantiate their total aggregate contributions by arguing that otherwise non-compensable claims are valid and reimbursable under the Plan because they were paid pursuant to the TDP which the Court found to be "reasonable," "fair," "equitable," and otherwise in compliance with the provisions of the Bankruptcy Code. Doc. No. 8984 at 54; Doc. No. 8804 at 33. This contention is without merit as stated below.

280. Nothing in the Plan, Plan Documents, including the TDP, these Findings of Fact and Conclusions of Law or the Confirmation Order purports to justify or substantiate the amount of PPG's Trust Contribution or Corning's Trust Contribution for coverage purposes and nothing therein is to be construed or interpreted as making a finding for purposes of coverage litigation. Moreover, both PPG and Corning have agreed, under the terms of §11.17.3 (which includes an

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 89 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 89 of 143

injunction) not to offer into evidence this Court's findings in coverage litigation.

281. Under its second theory, Mt. McKinley next contends that if the Plan Supporters seek to recover from Mt. McKinley, under their insurance policies with Mt. McKinley, on a "per claim" basis, they will rely on the TDP to excuse their obligations to cooperate and assist Mt. McKinley and to substantiate coverage claims under insurance policies, relying on the Court's approval of the TDP. Doc. No. 8804 at 34-35. This contention is also without merit as stated below.

282. Nothing in the Plan, Plan Documents, including the TDP, these Findings of Fact and Conclusions of Law or the Confirmation Order purports to justify or substantiate the amount of PPG's Trust Contribution or Corning's Trust Contribution for coverage purposes and nothing therein is to be construed or interpreted as making a finding for purposes of coverage litigation. The Plan does not bind any non-participating insurer, including Mt. McKinley, to settlements made between the Asbestos PI Trust and asbestos claimants, nor does it require the objecting insurers to pay claims that are resolved pursuant to the TDP. Those issues, should they ever arise, are preserved for coverage litigation.

283. This Court makes no finding or conclusion that any claim processed under the TDP or paid by the Asbestos PI Trust is or is not a claim which requires an insurer to reimburse or pay PPG or Corning, or for coverage litigation purposes.

## 5.    The Plan Does Not "Inflate" Liability

284. Mt. McKinley contends that TDP §5.1(a)(2) "extends and revives expired limitations periods for otherwise time-barred claims." Doc. No. 8984 at 45. Section 5.1(a)(2), however, addresses claimants who had timely asserted a claim prepetition against one or more Asbestos Protected Parties, and with claimants whose ability to file claims postpetition had been

89

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 90 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 90 of 143

stayed. Plan, Exhibit B (TDP) at §5.1(a)(2).[27] Thus, Mt. McKinley's objection in this regard is

---

[27]Section 5.1(a)(2) is titled "Effect of Statutes of Limitation and Repose" and provides:

> To be eligible for a place in the FIFO Processing Queue, (i) a Channeled Asbestos PI Trust Claim first filed in the tort system against any Asbestos Protected Party prior to the Petition Date must not be barred by the applicable federal, state and foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, and (ii) a Channeled Asbestos PI Trust Claim that was not filed against any relevant Asbestos Protected Party in the tort system prior to the Petition Date must not be barred by the applicable federal, state and foreign statute of limitation that was in effect at the time of the filing with the Asbestos PI Trust.

> The running of the relevant statute of limitation shall be tolled for Channeled Asbestos PI Trust Claims as of the earliest of (i) the actual filing of the claim against PCC or any PPG Entity or any Corning Entity prior to the Petition Date, whether in the tort system or by submission of the claim to PCC pursuant to an administrative settlement agreement; (ii) the tolling of the claim against PCC or any PPG Entity or any Corning Entity prior to the Petition Date by an agreement or otherwise provided such tolling was still in effect on the Petition Date; or (iii) the Petition Date.

> If a Channeled Asbestos PI Trust Claim meets any of the tolling provisions described in the preceding sentence and was not barred by the applicable federal, state or foreign statute of limitation at the time of the tolling event, it will be treated as timely filed if it is actually filed with the Asbestos PI Trust within three (3) years after the Initial Claims Filing Date. In addition, any holder of a Channeled Asbestos PI Trust Claim that was first diagnosed after the Petition Date, irrespective of the application of any relevant statute of limitation or repose, may file a claim with the Asbestos PI Trust within three (3) years after the date of diagnosis, or within three (3) years after the Effective Date, whichever occurs later. However, the processing of any Channeled Asbestos PI Trust Claim by the Asbestos PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

Section 6.3 provides a process for a claimant to withdraw a claim and file another

(continued...)

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 91 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 91 of 143

without merit and overruled.

285. Mt. McKinley contends that the term "exposure to Unibestos" as defined in TDP §5.3(a)(3)[28] is so broad that it could include products for which PPG or Corning has liability that cannot be channeled under §524(g). Doc. No. 8984 at 43. We disagree. "Exposure to Unibestos" is a requirement for a Channeled Asbestos PI Trust Claim to be entitled to Expedited Review. Plan, Exhibit B (TDP) at §5.7(b)(1) (second ¶). That section of the TDP also provides that in order to qualify for payment under the TDP the claimant "must demonstrate a minimum exposure to an asbestos-containing product for which the Asbestos PI Trust has liability" and refers to §5.3(a)(3) (Disease Levels, Scheduled Values, and Medical/Exposure Criteria).

286. Therefore, Mt. McKinley has misinterpreted the term "exposure to Unibestos" as used in the TDP. The definition expressly is limited to "an asbestos-containing product manufactured, marketed, sold or distributed by PCC," whether under the "Unibestos" label or another "label for which PCC, any PPG Entity or any Corning Entity" has liability. The definition is expressly tied to the "conduct of, claims against, or demands on the debtor." §524(g)(4)(A)(ii). Accordingly, regardless of the label used for the product, the product must

---

[27](...continued)
without affecting the status of the claim for statute of limitations purposes but the claim's place in the FIFO Processing Queue will be based on the date of the filing of what is, in effect, an amended claim. A claimant can also request that the Trust defer consideration of the claim for a maximum of three years without affecting the claim's status for statute of limitation purposes. This in essence is a tolling provision.

[28]"The term 'exposure to Unibestos' means exposure to an asbestos-containing product manufactured, marketed, sold or distributed by PCC under the 'Unibestos' or other label for which PCC, any PPG Entity or any Corning Entity has direct or indirect liability; however, the Asbestos PI Trust shall be free to contest whether a particular Unibestos product was in fact manufactured, marketed, sold or distributed by PCC." Plan, Exhibit B (TDP) at §5.3(a)(3) at n. 3.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 92 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 92 of 143

have been "manufactured, marketed, sold or distributed by" PCC in order to satisfy the definition of "exposure to Unibestos" for purposes of Expedited Review and in addition must meet the criteria set forth in §5.3(a)(3) of the TDP.

### 6.   The TDP are Similar to Criteria Used by the Debtor to Settle Claims in the Tort System

We credit the evidence, when cited, as to each of the following findings:

287. The TDP provide a mechanism for resolving all channeled Asbestos PI Trust claims by determining (a) what can be settled and therefore paid and (b) what the settlement amount will be. Plan, Exhibit B (TDP) at 1 (first paragraph).

288. The primary purpose of the TDP is to distribute money fairly and equitably to all present claimants and future demand holders. The TDP "is designed to "provide fair, equitable, and substantially similar treatment for all Channeled Asbestos PI Trust Claims." Plan, Exhibit B (TDP) at §1.1.

289. The TDP operate by administratively resolving claims that satisfy enumerated medical and exposure criteria rather than litigating cases to closure in the tort system. Plan, Exhibit B (TDP) at §2.2; *see also* Doc. No. 7823, Tr. 6/3/2010 at 118:22-24 (Fitzpatrick) ("If a claimant submits a claim that meets the disease requirements under this TDP, then that claimant will be offered a settlement offer").

290. The TDP's medical and exposure criteria are in keeping with the settlement criteria the Debtor applied when deciding whether to settle claims when it was a defendant in the tort system. PM Tr. 5/3/2004 at 125:2-12, 15-21 (Ellis) ("equally as stringent, if not more stringent, than what we were finding in the tort system").

291. After the decision in *Simmons v. Pacor,* 674 A.2d 232 (Pa. 1996), limiting recovery

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 93 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 93 of 143

for asymptomatic pleural thickening, and the adoption in some states of "tort reform" measures,

the Debtor continued to settle with "unimpaired" claimants. Tr. 6/3/2010 at 152:25-156:22

(Fitzpatrick).

292. After the *Pacor* decision, Mt. McKinley itself, in its capacity as an insurer of the

Debtor, entered into a settlement with the Debtor to pay full policy limits, and reviewed the

Debtor's files on claims settled and submitted to Mt. McKinley. AM Tr. 5/4/2004 at 42:21-

43:10 (Ellis); 3/10/2004 DEP. Tr. at 26:16-30:24, 31:20-34:25, 46:4-9 (Kenney).

293. Mt. McKinley contends that the TDP permit payment of claims with no evidence of

pulmonary functional impairment (Disease Levels I and II). However, the TDP require

diagnosis of certain diseases **and** exposure.[29] Therefore, it is reasonable for the Plan to provide

for payment of such claims which meet the exposure and medical criteria set forth in the TDP to

avoid the risk of litigation over whether a particular jurisdiction's law limiting recovery applies

to a particular claim or whether the claim meets a particular jurisdiction's impairment test.

---

[29]Disease Levels I and II require:

> Asbestos/Pleural Disease (Level II): $5,500
> (1) *Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and* (2) six months *exposure* to Unibestos during July 31, 1962 - December 31, 1972, or to another asbestos-containing product manufactured, marketed, sold or distributed by PCC prior to December 31, 1982; and (3) five years cumulative occupational exposure to asbestos.

> Other Asbestos Disease (Level I - Cash Discount Payment): $400
> (1) *Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy* (other than mesothelioma)*, and* (2) *exposure* to Unibestos during the period July 31, 1962 - December 31, 1972, or to another asbestos containing-product manufactured, marketed, sold, or distributed by PCC prior to December 31, 1982.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 94 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 94 of 143

Further, modest matrix-authorized payment of Disease Levels I and II claims that meet the requisite exposure and medical criteria avoids the risk to the Trust that a claimant's level of non-malignant disease may worsen to a more severe level of pleural thickening or asbestosis. Plan, Exhibit B (TDP) at §5.3(a)(3).  A second claim may be asserted only when a claimant who had a non-malignant disease later develops a malignant one.[30]

294.  Mt. McKinley contends that the TDP definition of "Bilateral Asbestos-Related Nonmalignant Disease,"  TDP at n.4, might include some borderline cases that do not satisfy diagnostic criteria of the American Thoracic Society ("ATS") or otherwise might be attributable to causes other than asbestos (see Doc. No. 7902 at ¶¶ 105-121 and 144) and, therefore, the TDP criteria do not meet a minimum threshold.  Mt. McKinley's allegations that, because the TDP are too lax, the Court cannot find that the TDP are fair and equitable and must find that the TDP were not proposed in good faith, Doc. No. 8984 at 44, were addressed and rejected in our 2011 Opinion.  453 B.R. 605-10.[31]  We again overrule this objection.

---

[30]TDP §5.9, Second Disease (Malignancy) Claims, permits holders of Channeled Asbestos PI Trust Claims, including prepetition liquidated claims that involved a **non-malignan**t asbestos-related disease in Disease Levels I thorough IV to assert a new claim if the claimant develops a **malignant** disease (Disease Levels V through VIII).  The payments will not be reduced by any amount previously paid to the claimant as long as the malignant disease had not been diagnosed when the claimant was paid with respect to the original non-malignant disease claim.

[31]Mt. McKinley relied on the testimony of Dr. Joseph J. Renn III.  We credited then and do so now the testimony of Dr. Laura Welch finding that she had sufficiently supported the standards she employed in reaching her expert opinions.  We found that she specifically addressed each of Dr. Renn's criticisms of the TDP and based on the testimony and evidence we credited her conclusion that  Dr. Renn's opinion was inconsistent with the opinion of the American Thoracic Society.  We emphasize again, as we did in 2011, that "the purpose of the TDP . . . is to provide a mechanism for the processing and settlement of claims.  The TDP contains medically reasonable criteria for purposes of the settlement mechanisms the trust created in this bankruptcy must employ."  453 B.R. at 611.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 95 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 95 of 143

295. We find that the provisions of TDP §5.7(a)(2) (Credibility of Medical Evidence) requires the Trust to have "reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards."  This section of the TDP requires that the Trust find that:

> medical evidence submitted comply with  recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to PCC, any PPG Entity or any Corning Entity to settle for payment similar disease cases prior to PCC's bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos PI Trust may seek to rebut the presumption.

296. Mt. McKinley also objects to the TDP criteria for mesothelioma, lung cancer, and other cancers asserting that they do not sufficiently exclude other potential causes of such cancers.  *See* Doc No. 7902 at ¶¶ 91-99, 100-104, 124-131.  Again, the sufficiency of the TDP criteria was addressed and approved in our 2011 Opinion and Mt. McKinley's objections on that score were overruled.  There is nothing new to indicate that a different ruling should be made and we again make the same determination.

### 7.      The Expedited Review Criteria Set Forth in the TDP Are Medically Reasonable

297. The Plan Proponents' expert, Dr. Laura Welch, is an expert in the fields of internal medicine and occupational medicine and is well qualified to express opinions regarding the epidemiology of asbestos related diseases and the diagnosis of asbestos related diseases.  Tr. 6/10/2010 at 30:23-25-31:1-2.  The Court credits her testimony as we did in 2011.  *See* 453 B.R. at 605 and n.44, 611.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 96 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 96 of 143

298. Dr. Welch testified that the TDP are medically reasonable and are supported by the relevant science and medical literature. *See generally* Tr. 6/10/2010 at 33-62 (Welch) (testifying that the TDP are medically reasonable and that the following studies support the reasonableness of the TDP's criteria:  Exhibit P-135 (Tossavainen, "Consensus Report: Asbestos, Asbestosis, and Cancer:  The Helsinki Criteria for Diagnosis and Attribution" (1997)); Exhibit P-134 (American Thoracic Society, "Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos" (Dec. 12, 2003)).

299. Dr. Welch testified that, although the TDP contain a presumption that a diagnosis of mesothelioma will be presumed to be malignant, the Trust may rebut the presumption, thereby allowing the Trust to distinguish benign from malignant mesothelioma. Tr. 6/10/2010 at 36:3-5; 36:21-37:2 (Welch); Plan, Exhibit B (TDP) at §5.7(a)(1), n.6.

300. Dr. Welch testified, and cited publications supporting her opinion, that asbestosis is not a prerequisite to diagnosing a lung cancer as asbestos-related. Tr. 6/10/2010 at 38:11-39:22; 41:3-19 (Welch); Exhibit P-135 (Consensus Report:  Asbestos, Asbestosis, and Cancer:  the Helsinki criteria for diagnosis and attribution); Exhibit P-136 (Douglas W. Henderson *et al.*, After Helsinki:  A Multidisciplinary Review of the Relationship Between Asbestos Exposure and Lung Cancer, with Emphasis on Studies Published during 1997-2004, Pathology, 36(6):517-50) ("Helsinki"); Exhibit MMIC-9 (Murray A. Finkelstein, Radiographic Asbestosis Is Not a Prerequisite for Asbestos-Associated Lung Cancer in Ontario Asbestos-Cement Workers, Am. J. of Industrial Medicine, 32:341-348); Exhibit MT. MCKINLEY-12 (A. Reid, *et al.*, The Effect of Asbestosis on Lung Cancer Risk Beyond the Dose-Related Effect of Asbestos Alone, Occupational Environmental Medicine 62:885-889).

301. Dr. Renn, Mt. McKinley's expert, questioned the reasonableness of the TDP's

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 97 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 97 of 143

definition of "Non-Smoker" and whether the TDP adequately accounts for the role of smoking in lung cancer. Tr. 6/10/2010 at 46. We find that it does.

302. Dr. Welch, whose testimony we credit, testified that both asbestos and smoking increase the risk of lung cancer and both exposures together pose an even greater risk; the combination results in multiplication of effect. *Id.* at 46:15-22 (Welch); 47:7-13 (Welch).

303. Dr. Welch testified that there are

> some good studies that demonstrate when people quit smoking, their risk of lung cancer starts to go down and actually we have -- there's several papers in my book here that illustrate that and there's some good graphs in those papers that show that it continues to go down. So, the day you quit, it goes down a little bit. When you're five years out, it's probably cut about in half and when you're ten years out, it's down substantially more. The question of what actual number of years you choose is a judgment. And my opinion, looking at those papers, I think it's medically reasonable because what the TDP is saying is that, the way I understand it, if someone is a non-smoker, they can come back and ask for additional -- it primarily applies to -- I mean in the lung cancer categories, they can come back and say, essentially that -- well, asbestos was a higher contributor to my lung cancer because I never smoked or because I quit 12 years or more ago. And, based on the reduction in risk of lung cancer after you quit smoking, it's apparent that the smoking contribution goes down when people have quit. The TDP needs to choose a number and 12 is perfectly reasonable, based on that literature.

Tr. 6/10/2010 at 48:7-25 (Welch).

304. Dr. Welch testified, and cited publications supporting her opinion, that the TDP definition of "Non-Smoker,"[32] used with respect to claims for lung cancer, is medically reasonable. *See* Tr. 6/10/2010 at 47:18-50:6; 52:10-53:16 (Welch). Dr. Welch relied on

---

[32]"'Non-Smoker' means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer." Plan, Exhibit B (TDP) at 16, n.5.

Case 2:13-cv-01639-JFC Document 1 Filed 11/18/13 Page 98 of 100
Case 00-22876-TPA Doc 9443-2 Filed 05/24/13 Entered 05/24/13 19:18:36 Desc
Corrected Order to fix Typo Page 98 of 143

Exhibits P-408 and P-409 with respect to the decreased risk of lung cancer among non-smokers and those who have not smoked in a certain number of years. Exhibit P-408 (A. Crispo *et al.,* The Cumulative Risk of Lung Cancer Among Current, Ex- and Never-Smokers in European Men, British Journal of Cancer 91:1280); Exhibit P-409 (Nina S. Godtfredsen *et al.,* Effect of Smoking Reduction on Lung Cancer Risk, JAMA 294(12):1505); Exhibit MT. MCKINLEY-19 (Kenji Wakai, *et al.,* Decrease in Risk of Lung Cancer Death in Males after Smoking Cessation by Age at Quitting: Findings from JACC Study, Jpn. J. Cancer Res. 92:821).[33]

305. Dr. Welch also testified that the diagnostic and exposure criteria for nonmalignant asbestos-related disease in TDP Disease Levels I, II, III, and IV were medically reasonable. *See* Tr. 6/10/2010 at 54:8-55:24 (regarding the American Thoracic Society 2004 position statements and guidelines with respect to the diagnosis and management of asbestosis, asbestos-related pleural disease). *Id.* at 56:11-58:11, 58:16-61:5. Dr. Welch testified concerning the requirements of the ATS with respect to diagnosing asbestosis, how asbestos contributes to obstructive lung disease and the fact that the ATS does not require a showing of functional impairment in order for a diagnosis of asbestosis or other non-malignant asbestos-related disease, to be made. *Id.* She also testified that the TDP focus on asbestosis, asbestos-related pleural plaque, and their restrictive effect on lung function. *Id.* She testified that it is medically appropriate for the TDP to combine asbestosis and pleural disease into the same category for Disease Levels I, II and III because the TDP is designed to compensate those with different

---

[33]Mt. McKinley's expert, Dr. Renn's testimony is consistent with Dr. Welch's opinion that one's chances of getting lung cancer decreased once one stops smoking. Tr. 6/4/2010 at 52:14-5-53:1-3. Dr. Renn agreed that the Helsinki criteria require "heavy" exposure to asbestos as sufficient to cause lung cancer, that for at least one lung cancer the TDP requires substantial occupational exposure to asbestos. Tr. 6/4/2010 at 109. We credit Dr. Welch's testimony and analysis.

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 99 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo    Page 99 of 143

levels of impairment. *Id.* at 60:3-8. She further testified that:

> The different categories focus on different levels of
> impairment and the pulmonary function criteria that are in the TDP
> focus on identifying restrictive lung disease. So, if someone has
> restrictive lung disease, whether it's caused by asbestosis or
> asbestos related pleural plaque, it's appropriate to combine them.
> It's an asbestos related disease causing restriction.
>
> So, if you separated them out, you'd have . . . more
> categories, but you'd have the same functional result because
> they're grouped by the degree of impairment . . . .

*Id.* at 9-20.

306. Dr. Welch also testified that the ten year latency period set forth in the TDP was

medically reasonable and that Helsinki (Exhibit P-135) recommends a minimum of ten years.

Tr. 6/10/2010 at 61:10-62:13; Plan, Exhibit B (TDP) §5.7(a)(1) (providing for a period of at least

ten years between the date of first exposure to asbestos/asbestos-containing products and

diagnosis).

307. Dr. Welch testified that it is medically reasonable for Disease Level V of the TDP to

provide compensation for claimants with colorectal, esophageal, pharyngeal, and stomach

cancers (who also have evidence of bilateral asbestos-related nonmalignant disease and of

exposure to Unibestos or other PCC product). Tr. 6/10/2010 at 115:4-124:20 (Welch). She

reviewed the committee report of the Institute of Medicine ("IOM"), prepared at the request of

Congress, on the relationship between asbestos and "other cancers," i.e., cancers other than lung

and mesothelioma. Tr. 6/10/2010 at 116:12-13. Dr. Welch testified that although the IOM

committee concluded that evidence is suggestive but not sufficient to infer a causal relationship

between asbestos and certain cancers, Tr. 6/10/2010 at 118:10-11, 22-24; 119:3-5, it is proper to

include those cancers in the TDP because the TDP has "substantial other requirements that

someone with one of these other cancers has to meet to get compensation." Tr. 6/10/2010 at

Case 2:13-cv-01639-JFC   Document 1   Filed 11/18/13   Page 100 of 100
Case 00-22876-TPA   Doc 9443-2   Filed 05/24/13   Entered 05/24/13 19:18:36   Desc
Corrected Order to fix Typo   Page 100 of 143

120:3-6.

308. Dr. Welch testified that it is reasonable for the TDP to accept pre-Effective Date findings by a physician that a disease is "consistent with" or "compatible with" asbestosis, given that some physicians do use such terminology, although she herself would diagnosis asbestosis. Tr. 6/10/2010 at 137:4. Requiring claimants with existing medical records to obtain a new diagnosis to satisfy a more stringently worded standard could impose hardship. Tr. 6/10/2010 at 135:18-136:9, 137:5-6 (Welch).[34]

309. Dr. Welch is a credible and knowledgeable witness with extensive knowledge of the medical literature as it relates to asbestos diseases. Her testimony on the TDP criteria is more persuasive on that topic than that of Dr. Renn. The Court accepts her analysis and finds, as we did before, that the TDP Expedited Review criteria are medically reasonable.

**8.      The Structural Features of the TDP are Reasonable and Appropriate**

310. TDP §4.4, which provides that the Trustees, with the consent of the TAC and the FCR, may increase the "Payment Percentage" due to a material change in the estimates of the Asbestos PI Trust's future assets and/or liabilities and, in such event, make supplemental payments to claimants who previously received payments from the Asbestos PI Trust based on a lower Payment Percentage, provides a reasonable accommodation of the interests of present claimants and future demand holders. Plan, Exhibit B (TDP) at §4.4.

---

[34]"The way it's used in the TDP is reasonable, because it's used in the TDP for claims that were filed before the . . . effective date of the plan, and so . . . people are using existing medical records that couldn't have been asked to conform to the" TDP requirements. Tr. 6/10/2010 at 135:24-136:3. For example, if you do not accept a pre-Effective Date diagnosis that findings are "consistent with asbestosis" you could be asking a dead person to get an additional set of records and it is therefore reasonable to accept preexisting records even though there may be a higher standard for new claims. Tr. 6/10/2010 at 4-9. Note that this case has stayed all activity regarding asbestos claims and suits for over thirteen years.